NO. COA13-1303

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

JOSEPH FAZZARI, *et al.*,
    Plaintiffs,

    v.                          Mecklenburg County
                                   Nos. 08 CVS 27336, 09 CVS 18264

INFINITY PARTNERS, LLC, *et al.*,
    Defendants.

Appeals by Plaintiffs[1] from orders entered 8 and 22 March 2012 by Judge W. Erwin Spainhour in Mecklenburg County Superior Court. Heard in the Court of Appeals 7 May 2014.

*Ellis & Parker PLLC,*[2] *by L. Neal Ellis, Jr., and Nathaniel Parker, for Plaintiffs.*

*McGuireWoods LLP, by H. Landis Wade, Jr., and Steven N. Baker, for Defendant Fifth Third Bank.*

*Robinson Bradshaw & Hinson, P.A., by Douglas M. Jarrell and Ty E. Shaffer, for Defendant Wachovia Bank, N.A., now known as Wells Fargo Bank, N.A.*

STEPHENS, Judge.

---

[1] The specific plaintiffs appealing from each order are identified in our discussion of the procedural history of this case.

[2] Plaintiffs' brief styles their appellate counsel as "Ellis & Anthony" while their reply brief lists "Ellis & Parker, PLLC[.]" Both briefs name the same two individual attorneys.

*Procedural History and Factual Background*

This appeal arises from the 2007 failure of Grandfather Vistas, a real estate development located in Caldwell County. In 2006, approximately 1,000 acres of land in Caldwell County was purchased for $10.9 million, which Defendants Infinity Partners, LLC; Infinity Real Estate Partners, LLC; Source One Communities LLC; Prudential Source One, LLC; and Peerless Real Estate Services, Inc.,[3] planned to develop. The purchase was financed through a "land banking" program in which the developers sold approximately sixty ten-acre lots for $500,000 each ("the founders' lots"), with "buyback" contracts that guaranteed the developers would repurchase each lot for $625,000 within one year. The purchase contracts for the founders' lots also included provisions for the developers to pay the purchasers' interest from closing until the repurchase. The purchase contracts stated that purchasers would obtain fixed rate financing on a thirty-year term at an initial interest rate not to exceed 7.5% per annum with a loan-to-value ratio of at

---

[3] The defendants noted here are referred to collectively as "the developers."

least 90%.[4] Following repurchase of the founders' lots, the developers planned to subdivide the lots into one-acre retail parcels for resale. Defendant Blue River Ridge at Blowing Rock, LLC was formed by Peerless and Source One to purchase, own, and develop Grandfather Vistas and to eventually buy back the founders' lots.

The developers used a real estate company to market the founders' lots, and the real estate company, in turn, created a marketing plan that relied on preferred lender arrangements with First Charter Bank of North Carolina;[5] Wachovia Bank, N.A.;[6] and SunTrust Banks, Inc.[7] (collectively, "the lenders"). Beginning in May 2006, the developers began selling founders' lots, and

---

[4] However, as discussed herein, no Plaintiff obtained a loan on these terms. Rather, all of their loans for purchase of the founders' lots were of much shorter terms, many for as little as two years.

[5] First Charter Bank was acquired by Fifth Third Bank, N.A., which, following a merger on 30 September 2009, became known as Fifth Third Bank. Throughout this opinion, unless otherwise specified, defendants Brian Kiser and Jeff Collins, former loan officers with what was then First Charter Bank, are included in all references to "Fifth Third" or "the lenders."

[6] Wachovia Bank, N.A., was a subsidiary of Wachovia Corporation. On 31 December 2008, Wachovia Corporation merged with Well Fargo & Company. We refer to this defendant hereafter as "Wells Fargo."

[7] The proper party was actually SunTrust Mortgage, Inc., a wholly owned subsidiary of SunTrust Banks, Inc.

Plaintiffs were among the purchasers. SunTrust and Fifth Third used Defendant A. Greg Anderson, d/b/a Anderson & Associates, ("Anderson") exclusively to perform appraisals of the founders' lots in connection with those sales. Wells Fargo did not employ Anderson for any appraisals at issue in this appeal, using several other appraisers instead ("the Wells Fargo appraisers"). Anderson and the Wells Fargo appraisers valued every founder's lot at $500,000, regardless of the lot's specific qualities or location in Grandfather Vistas. That value was the exact minimum amount needed in order to meet the loan-to-value provision of the purchase contracts. The actual value of the lots ranged from $40,000 to $81,000.[8]

Little of the money raised through sales of the founders' lots was invested in Grandfather Vistas, and by 2007, all

---

[8] Anderson was later suspended by the North Carolina Appraisal Board because of his involvement in another land development scheme gone awry which likewise resulted in lawsuits and subsequent appeals to this Court. This Court affirmed summary judgment for Anderson and another appraiser in that matter. *See Williams v. United Cmty. Bank*, __ N.C. App. __, 724 S.E.2d 543 (2012). Fifth Third, Peerless, and several of the individual developer defendants were also involved in that land development/investment scheme. In an opinion filed 6 December 2011, this Court affirmed summary judgment in favor of Fifth Third against the *Williams* plaintiffs on, *inter alia*, Chapter 75 claims. *See In re Fifth Third Bank, N.A.*, 217 N.C. App. 199, 719 S.E.2d 171 (2011), *cert. denied*, 366 N.C. 231, 731 S.E.2d 687 (2012).

development activity had ceased. None of the founders' lots were ever repurchased from Plaintiffs. As a result, on 16 December 2008, Plaintiffs initiated a lawsuit in file number 08 CVS 27336 against various defendants, including, *inter alia*, the developers, the lenders, and Anderson. Plaintiffs' complaint included claims against the lenders for fraud, fraud in the inducement, negligence, negligent misrepresentation, conversion, civil conspiracy, and unfair and deceptive trade practices ("UDTP") pursuant to Chapter 75 of our General Statutes.[9] Claims brought against Anderson included fraud, fraud in the inducement, negligence, negligent misrepresentation, conversion, civil conspiracy, and UDTP.[10] The lenders filed answers in February and March 2009, asserting various defenses and

---

[9] Plaintiffs did not bring claims for fraud, fraud in the inducement, or UDTP against Wells Fargo or SunTrust Bank.

[10] On 19 May 2009, the Chief Justice designated the case in file number 08 CVS 27336 and a related case in file number 09 CVS 6239 as exceptional pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts. The Honorable Timothy L. Patti, resident Superior Court Judge in Gaston County, was designated to preside over the cases. The case in 09 CVS 6239 appears to involve a lawsuit by two additional purchasers of founders' lots against Anderson, the lenders, the developers and others involved in the investment scheme.

counterclaims, including default by Plaintiffs on promissory notes securing their loans.[11]

On 15 July 2011, Anderson moved for summary judgment on all remaining claims against him,[12] asserting, *inter alia*, that Plaintiffs could not show reliance on any of his alleged misrepresentations. On the same date, the lenders filed motions for summary judgment as to all remaining claims against them,[13] on their counterclaims against Plaintiffs, and for attorneys' fees. On 16 February 2012, the court[14] entered summary judgment in favor of Anderson on all claims against him ("the Anderson

---

[11] By order entered 27 July 2009, Plaintiffs were permitted to file an amended complaint, and the lenders filed amended responsive pleadings thereafter.

[12] From our review of the extraordinarily extensive record in these appeals, it appears that some of the original plaintiffs settled or withdrew their claims, or otherwise dropped out of the case before the lenders and Anderson filed their motions for summary judgment.

[13] In the motions, Wells Fargo listed Plaintiffs' remaining claims against it as negligence, negligent misrepresentation, conversion, and civil conspiracy.

[14] As noted *supra*, the Chief Justice designated Judge Patti to preside over the matter. Judge Patti signed orders entered in the matter through September 2010. Following Judge Patti's retirement, the Honorable W. Erwin Spainhour presided over the matter and signed all orders entered by the court from July 2011 on, including the lenders' summary judgment order and Anderson's summary judgment order.

summary judgment order"). On 8 March 2012, the trial court entered an order which (1) granted the lenders' motions for summary judgment, (2) dismissed with prejudice all remaining claims against the lenders, (3) denied Plaintiffs' motion to amend their complaint to add UDTP claims against Wells Fargo and SunTrust,[15] and (4) taxed costs against Plaintiffs ("the lenders' summary judgment order"). On the same day, the court entered judgments in favor of the lenders on their counterclaims against Plaintiffs Joseph Fazzari (Fifth Third); Danuta K. McIvor (Fifth Third); Scott W. McQuay (Fifth Third); Charles H. Owens (Fifth Third); William Decker (Fifth Third); Carol H. Harris (Wells Fargo); Roscoe E. Harris (Wells Fargo); Renee C. Miller, as Trustee of Renee C. Miller Living Trust (Wells Fargo); Darryl Strack (Wells Fargo); Kathryn M. Strack (Wells Fargo); Christa S. Tighe (Wells Fargo); and James K. Tighe, Jr. (Wells Fargo). On 19 March 2012, the court entered an order allowing Anderson's verified bill of costs. On 22 March 2012, the court entered orders allowing the lenders' verified bills of costs.

In June 2013, Plaintiffs filed a motion for default judgment against Defendants Kevin J. Foster, Neil O'Rourke, and

---

[15] *See* footnote 9, *supra*.

Anthony Porter. Orders of default had previously been entered against these defendants, who had key roles in managing Peerless, one of the Grandfather Vistas development entities. The motion also sought voluntary dismissals with prejudice of the remaining claims against Defendants P. Marion Rothrock; Rothrock Engineering; Blue River Ridge at Blowing Rock, LLC; Grandfather Vistas, LLC; Infinity Partners, LLC; and Infinity Real Estate Partners, LLC. On 10 July 2013, the trial court entered a final order in the matter which (1) granted Plaintiffs' motion for default judgment jointly and severally against Foster, O'Rourke, and Porter in the amount of $22,588,156.07, and (2) granted Plaintiffs' motion to voluntarily dismiss with prejudice and without costs the other remaining defendants.

On 8 August 2013, Plaintiffs Joseph Fazzari; K. Scott Fischer; Thomas L. Barnhardt; Kimberly Barnhardt; Windspirit Properties, LLC; William Decker; Douglas M. Ellis; Kelly Ellis; Lynn Falero; Ralph Falero; Kenneth Fischer; Carol H. Harris; Roscoe E. Harris; Scott W. McQuay; Renee C. Miller, as Trustee of Renee C. Miller Living Trust; Charles H. Owens; Danuta K. McIvor; Darryl Strack; and James K. Tighe, Jr., gave notice of appeal from the 8 March 2012 lenders' summary judgment order and

the 22 March 2012 lenders' cost orders.[16]  On the same date, Plaintiffs Joseph Fazzari; Danuta K. McIvor; Scott W. McQuay; Charles H. Owens; William B. Decker; Carol H. Harris; Roscoe E. Harris; Renee C. Miller; Darryl J. Strack; Kathryn M. Strack;[17] Christa S. Tighe; and James K. Tighe, Jr., gave notice of appeal from the 8 March 2012 judgments entered against them on the various lenders' counterclaims.[18]

On 16 December 2013, Wells Fargo moved to dismiss the appeals in COA13-1303 of Darryl Strack; James K. Tighe, Jr.;

---

[16] On 5 March 2014, Plaintiffs' counsel notified this Court that K. Scott Fischer and Kenneth Fischer, the only remaining appellants as to SunTrust, had reached a final settlement of all matters at issue in this appeal, and moved to dismiss SunTrust from the appeal.  That motion was allowed by order of this Court entered 7 March 2014.  Accordingly, in the discussion section of this opinion, "the lenders" refers only to Wells Fargo and Fifth Third.

[17] Kathryn M. Strack withdrew her notice of appeal on 26 September 2013.

[18] On 8 August 2013, in COA13-1304, various plaintiffs gave notice of appeal from the 16 February 2012 Anderson summary judgment order and the 19 March 2012 cost order.  On 18 November 2013, some of those plaintiff-appellants gave notice that they were withdrawing their appeals as to the Anderson summary judgment order, but did not withdraw their appeals from the cost order.  However, on 30 April 2014, the remaining plaintiff-appellants gave notice to this Court that they had reached a final settlement of all claims against Anderson, rendering the appeal in COA13-1304 moot.  They moved to dismiss that appeal, and this Court granted that motion and dismissed the appeal in COA13-1304 by order entered 30 April 2014.

Christa S. Tighe; and Renee Miller (collectively, "the bankruptcy appellants"). The motion was referred to this panel by order entered 6 January 2014. In June and July 2012, the bankruptcy appellants filed cases under Chapter 7 of the United States Bankruptcy Code. In September and October 2012, all of the bankruptcy appellants' obligations to Wells Fargo arising from the costs order and the judgments on Wells Fargo's counterclaims were discharged. Wells Fargo asserts that the bankruptcy appellants could recover a windfall if this Court resolves this appeal in Plaintiffs' favor. In light of the result reached in this matter, resolving all issues in favor of the lenders as discussed below, we dismiss as moot Wells Fargo's motion to dismiss.

## *Discussion*

Plaintiffs argue that the trial court erred in granting the lenders' motion for summary judgment on the claims for (1) negligence and negligent misrepresentation and (2) UDTP.[19] We affirm.

### *I. Standard of review*

---

[19] Plaintiffs have abandoned their appeals as to the trial court's grant of summary judgment on their claims for fraud and civil conspiracy by failing to argue them in their brief. *See* N.C.R. App. P. 28(a).

It is well settled that summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. The movant must clearly demonstrate the lack of any triable issue of fact and entitlement to judgment as a matter of law. The record is considered in the light most favorable to the party opposing the motion.

*Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 219-20, 513 S.E.2d 320, 324 (1999) (citations, internal quotation marks, and emphasis omitted).

*II. Negligence and negligent misrepresentation claims*

Plaintiffs first contend that the trial court erred in granting summary judgment on their negligence and negligent misrepresentation claims against the lenders. We disagree.

North Carolina expressly recognizes a cause of action in negligence based on negligent misrepresentation. It has long been held in North Carolina that the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care.

*Walker v. Town of Stoneville*, 211 N.C. App. 24, 30, 712 S.E.2d 239, 244 (2011) (citations and internal quotation marks omitted).

In general, "a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party." *Camp v. Leonard*, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) (holding lender owed no duty to borrower with respect to inspection or appraisal of its collateral); *see also Lassiter v. Bank of N.C.*, 146 N.C. App. 264, 268, 551 S.E.2d 920, 923 (2001) (holding lender owed borrower no duty to inspect house being built with loan proceeds); *Perry v. Carolina Builders Corp.*, 128 N.C. App. 143, 150, 493 S.E.2d 814, 818 (1997) (holding lender owed no duty to ensure loan proceeds were used for a specific purpose in the absence of an express contract provision); *Wells v. N.C. Nat'l Bank*, 44 N.C. App. 592, 596, 261 S.E.2d 296, 298 (1980) (holding lender had no duty "to attend to details of the plaintiff's [land] purchase other than the financial services it offered").

Plaintiffs acknowledge that the lenders did not violate any duties expressly provided for in their loan agreements, but contend that the lenders owed them duties which "flow from at least two sources:  [(1)] a common law negligence duty and [(2)] the Mortgage Lending Act."  We are unpersuaded by either contention.

> A fiduciary duty arises when there has been a special confidence reposed in one who in

equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. However, an ordinary debtor-creditor relationship generally does not give rise to such a special confidence: the mere existence of a debtor-creditor relationship between the parties does not create a fiduciary relationship. This is not to say, however, that a bank-customer relationship will never give rise to a fiduciary relationship given the proper circumstances.

*Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 60-61, 418 S.E.2d 694, 699 (citations, internal quotation marks, and brackets omitted), *disc. review denied*, 332 N.C. 482, 421 S.E.2d 350 (1992).

Plaintiffs cite this Court's opinion in *Dallaire v. Bank of Am., N.A.,* for the proposition that, "when a financial institution undertakes to provide a customer with a service *beyond that inherent in the creditor-debtor relationship*, it must do so reasonably and with due care." __ N.C. App. __, __ n.5, 738 S.E.2d 731, 735 n.5 (2012) (emphasis added). In *Dallaire*, we reversed and remanded a grant of summary judgment in favor of the bank because there existed a question of fact "as to whether or not [the lender] sought to give legal advice to [the investment purchasers]." *Id.* Likewise, Plaintiffs assert that the lenders here went beyond the role of commercial lending when they acted as "cheerleaders" and "promoters" of

Grandfather Vistas by using Anderson and other appraisers to "churn[] out 'cookie cutter' appraisals," "interfered with the usual appraisal process," and "falsified loan documents and concealed the true purpose of the loans from underwriters[.]"[20]

However, our Supreme Court has recently reversed this Court's decision in *Dallaire*, reaffirming that, "[g]enerally, the home loan process is regarded as an arm's length transaction between parties of equal bargaining power and, absent

---

[20] As noted *supra*, Anderson performed all the appraisals of founders' lots for SunTrust and Fifth Third, but Wells Fargo used other appraisers in its underwriting process and did not employ Anderson. In his appraisals, Anderson used only other lots within Grandfather Vistas as comparable properties, or "comps," a crucial part of the valuation process. Plaintiffs assert that the lenders withheld information about the buyback and other provisions in the purchase contracts in an effort to manipulate the appraisal process to ensure inflated values. Plaintiffs also argue that Anderson's use of other Grandfather Vistas' lots as comps shows that the appraisal process was "rigged" toward inflated values. However, at least two of the Wells Fargo appraisers testified that they were aware of the buyback provision and considered the provision in performing their appraisals. One of those appraisers took the further step of using properties located from 16 to 23 miles outside of Grandfather Vistas as comps in his appraisal. *The Wells Fargo appraisers still valued each founder's lot at $500,000.* Accordingly, even if there were a cause of action for negligent underwriting of loans for the purchase of real estate, Plaintiffs would be unlikely to prevail since the actions complained of (concealment of contract agreement provisions and the use of Anderson for numerous appraisals) do not appear to have had *any* impact on the appraised values of the founders' lots.

exceptional circumstances, will not give rise to a fiduciary duty." *Dallaire v. Bank of Am., N.A.*, __ N.C. __, __, __ S.E.2d __, __ (2014), *available at* 2014 N.C. LEXIS 408. The Supreme Court went on to hold that, even in an exceptional circumstance where a loan officer owes a borrower some duty beyond the terms of the loan agreement, "a borrower cannot establish a claim for negligent misrepresentation based on a loan officer's statements . . . if the borrower fails to make reasonable inquiry into the validity of those statements." *Id.* at __, __ S.E.2d at __. Thus, where the borrowers

> put forth no evidence that they made [such an] inquiry or were prevented from doing so, they have failed to demonstrate the justified reliance necessary to support their negligent misrepresentation claim. . . . [and] the trial court [does] not err in granting summary judgment for [the lender on the borrowers'] negligent misrepresentation claim.

*Id.* at __, __ S.E.2d at __.

Here, far from being exceptional circumstances outside the normal creditor-debtor relationship, appraisals and underwriting are integral parts of the commercial lending process. Plaintiffs cite no case from this State in which courts have found that a lender had a common law duty to the borrower regarding the manner in which the lender undertook appraisals or

underwriting in connection with making loans.  To the contrary, our State's case law is clear that such appraisals and underwriting are for the benefit of the lenders, not for the borrowers.  *See, e.g.*, *Camp*, 133 N.C. App. at 559, 515 S.E.2d at 913.  Simply put, in North Carolina, there is no cause of action for negligent underwriting of loans for the purchase of real estate.  Further, even were there such a claim under the law of this State, Plaintiffs have forecast no evidence that they undertook their own independent inquiries into the values of the lots (such as obtaining their own independent appraisals) or were prevented from doing so.  Accordingly, Plaintiffs could not demonstrate the justified reliance necessary to support a negligent misrepresentation claim.

We find Plaintiffs' reliance on the lenders' alleged violations of the Mortgage Lending Act ("MLA")[21] equally unavailing.  Plaintiffs cite *Guyton v. FM Lending Servs., Inc.*, for the proposition that the MLA provides a source of duties for tort-based causes of action because "the relevant statutory language [of the MLA] expressly prohibits misrepresentation or concealment of the material facts likely to influence, persuade,

---

[21] The MLA was repealed effective 31 July 2009.  N.C. Sess. Laws 2009-374, s. 1.

or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan." 199 N.C. App. 30, 43, 681 S.E.2d 465, 475 (2009) (citations, internal quotation marks, ellipsis, and some brackets omitted)). In *Guyton*, the plaintiffs alleged that the lender defendant "actively and intentionally withheld the information that the property lay in a flood plain — including retention of surveys and certifications that contained relevant information and affirmative obstruction of [the p]laintiffs' access to important information — in order to induce [the p]laintiffs to purchase the property." *Id.* at 42-43, 681 S.E.2d at 475.

We reject Plaintiffs' reliance on the MLA on two bases. First, the MLA applied only to loans taken by natural persons "*primarily for personal, family, or household use*, primarily secured by either a mortgage or deed of trust on residential real property located in North Carolina." N.C. Gen. Stat. § 53-243.01(15) (2005) (emphasis added). Here, it is undisputed that the loans taken out by Plaintiffs were to finance the purchase of founders' lots as *investments* and not for residential use by the investment purchasers. The founders' lots were explicitly marketed as investment vehicles. The evidence in the record is that *no* Plaintiff took out a loan to purchase a founder's lot

"primarily for personal, family, or household use[.]" *Id.* Plaintiffs' own complaint describes the sale of the founders' lots as an "Investment Scheme" and consistently refers to the investment purchasers as "investors." The investment purchasers, who purchased the founders' lots *explicitly* and intentionally for investment purposes, cannot now claim the protection of a statutory scheme *explicitly* intended to govern residential rather than investment real estate mortgages.

Despite the fact that the loans were indisputably for investment purposes, Plaintiffs urge that the lenders are estopped from avoiding the applicability of the MLA on this basis because "[t]he lenders treated the loans as residential or home loans in order to avoid their own commercial/investment guidelines which would have prevented these loans from meeting the 90% [loan-to-value] financial condition in the purchase contracts. The lenders' guidelines for investment loans would permit loans only in the range of 65% to 80% [loan-to-value]." Plaintiffs defeat their own argument on this point. The lenders' internal guidelines regarding permitted loan-to-value ratios for various types of loans are not intended to protect Plaintiffs or any other borrowers. Rather, those policies are intended to protect the *lenders* and presumably reflect an

assessment of the relative riskiness of residential versus commercial real estate loans. The MLA applied to residential loans and was intended to protect residential borrowers. *See* N.C. Gen. Stat. § 53-243.01(15). As noted *supra*, Plaintiffs were *not* residential borrowers and their loans were *not*, in fact, residential loans. No labeling or treatment by the lenders in their internal underwriting process altered the loans' true nature so as to bring them under the ambit of the MLA.

Second, as discussed *supra*, even if the MLA did apply to Plaintiffs' loans such that it could be the source of duties for their negligence-based causes of action, for the reasons previously stated, Plaintiffs could not demonstrate the justified reliance required to prevail on those claims. In sum, we reject both of Plaintiffs' arguments and conclude that the trial court did not err in granting summary judgment for the lenders on the negligence-based claims.

*III. UDTP claims*

Plaintiffs Decker, Fazzari, McIvor, McQuay, and Owens[22] (collectively, "the Fifth Third plaintiffs") also contend that

---

[22] Plaintiffs did not assert any claims under Chapter 75 against Wells Fargo. In addition, the appeal in COA13-1303 as to

the trial court erred in granting summary judgment on their UDTP claims against Fifth Third.  We disagree.

It is well established that

> [a] claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75.1-1 must allege that:  (1) the defendant committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to the plaintiff's business.  Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish that the alleged misrepresentation proximately caused the injury of which [the] plaintiff complains.

*Sunset Beach Dev., LLC v. Amec, Inc.*, 196 N.C. App. 202, 211, 675 S.E.2d 46, 53 (2009) (citations, internal quotation marks, and brackets omitted).  "Actual reliance is demonstrated by evidence [the] plaintiff acted or refrained from acting in a certain manner due to [the] defendant's representations." *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 663, 464 S.E.2d 47, 57 (1995) (citation omitted).  Where a plaintiff cannot forecast evidence of actual reliance, summary

---

SunTrust was dismissed by order of this Court entered 7 March 2014.  The five plaintiffs named here are the only Fifth Third borrowers remaining in this appeal.

judgment for the defendants is proper. *Sunset Beach Dev., LLC*, 196 N.C. App. at 212, 675 S.E.2d at 54.

On appeal, the Fifth Third plaintiffs allege that they relied on misrepresentations by Fifth Third and the appraisals by Anderson in making their decisions to take out the loans on which they later defaulted. The Fifth Third plaintiffs also assert that Fifth Third wrongfully withheld the buyback agreements from their underwriters and Anderson in an effort to inflate the appraisals.

As for the alleged misrepresentations, our review of the record reveals that Decker, Fazzari, McIvor, and McQuay all testified that Fifth Third did not make any misrepresentations to them in regard to their loans. Owens testified that an employee of Fifth Third told him that Grandfather Vistas was "beautiful, that it should do well" and vouched that the developers were the "real deal."[23] However, even if these statements could be construed as factual misrepresentations as opposed to mere expressions of opinion, the remarks were made *after* Owens signed the purchase agreement, and, not

---

[23] The Fifth Third plaintiffs quote an additional alleged affirmative misrepresentation made by an agent of the bank to another borrower, but that borrower is not a party to this appeal. Accordingly, the statement is irrelevant in resolving the appeal of the Fifth Third plaintiffs.

surprisingly, Owens testified that he did not rely on the statements in deciding whether to buy his lot.

In regard to the assertion that Fifth Third withheld the buyback agreements from Anderson, the Fifth Third plaintiffs fail to note that Anderson testified to having a copy of at least one contract which included the buyback agreement. Further, as noted in footnote 20 *supra*, appraisers for Wells Fargo who *were* provided with copies of the buyback agreement still reached a value of $500,000 for each of the founders' lots they appraised.

As for the Fifth Third plaintiffs' alleged reliance on Anderson's appraisals, we find this appeal governed by the same reasoning employed in *In re Fifth Third Bank, N.A.*, and *Williams*, and in light of the virtually identical facts presented here, we reach the same result. As noted *supra*, those appeals involved, *inter alia*, UDTP claims by investors who took out loans from Fifth Third to purchase lots in a development called the Villages of Penland as part of an investment scheme.[24] *In re Fifth Third Bank, N.A.*, 217 N.C. App. at 202, 719 S.E.2d

---

[24] *Williams* was an appeal from the grant of summary judgment in favor of Anderson, while *In re Fifth Third Bank, N.A.*, arose from a summary judgment order in favor of the lender. We refer to the appeals collectively as "the Penland cases."

at 173-74. In the Penland cases, as here, the plaintiffs were purchasers of lots in another real estate investment scheme in which Anderson (and another appraiser) appraised a large of number of lots at an identical, inflated value to meet the loan-to-value conditions required to obtain bank loans. *Id.* at 207-08, 719 S.E.2d at 177. The Penland scheme, like that here, involved contracts that promised repurchase of lots with a guaranteed profit for the investors. *Id.* at 207, 719 S.E.2d at 177. As with Grandfather Vistas, the development was never completed, and investors were left with large loans and lots worth only a fraction of their appraised values. *Id.* at 202, 719 S.E.2d at 174.

In *Williams*, we noted that, "[w]here a plaintiff cannot forecast evidence of actual reliance, summary judgment for the defendants is proper[,]" __ N.C. App. at __, 724 S.E.2d at 549 (citation omitted), and then observed:

> All of the evidence shows that [the p]laintiffs made their decisions to invest in the development and contracted to do so without any awareness of, much less reliance on, the Anderson[] appraisals. Even had . . . Anderson[] appraised the lots differently, [the p]laintiffs would still have been obligated to purchase them at the prices agreed to in the purchase contracts. [The p]laintiffs cannot have relied on information they did not see and did not know existed (some of which did not, in

> fact, yet exist) at the time of their decisions. Because [the p]laintiffs forecast no evidence that they actually relied on the appraisals in deciding to make their investments, the trial court properly granted summary judgment to . . . Anderson[].

*Id.* at __, 724 S.E.2d at 550. Likewise, in *In re Fifth Third Bank, N.A.*, in considering summary judgment for Fifth Third on UDTP claims, we concluded that "no evidence tend[ed] to show that [the p]laintiffs' decision to invest . . . bore any relation to the appraised value of the lots which they purchased or that [the p]laintiffs relied in any way upon the allegedly defective appraisals which [Fifth Third] procured when they decided to invest . . . ." 217 N.C. App. at 211, 719 S.E.2d at 179. As a result, we affirmed summary judgment in favor of Fifth Third on the plaintiffs' UDTP claims. *Id.* at 213, 719 S.E.2d at 180.

Here, just as in the Penland cases, the purchase contracts were not subject to any appraisal contingencies.[25] Just as in

_____

[25] The Fifth Third plaintiffs assert that the purchase agreements *did* contain an appraisal contingency condition, to wit, language stating that a buyer "must be able to obtain a conventional loan at a fixed rate in the principal amount of 90% [loan-to-value] for a term of 30 years at an initial interest rate not to exceed 7.5% per annum . . . ." However, *none* of the purchasers obtained 30-year conventional loans on the terms specified in this language. Rather, each of the loans involved much shorter

the Penland cases, the Fifth Third plaintiffs signed their purchase contracts, obligating them to go forward with the purchase of the founders' lots, *before Anderson had even performed the appraisals* in question. Thus, just as in the Penland cases, the Fifth Third plaintiffs "cannot have relied on information they did not see and did not know existed (some of which did not, in fact, yet exist) at the time of their decisions" to sign the purchase contracts.[26] *See Williams*, __

_____

terms and higher rates of interest.

[26] As in the Penland cases, the Fifth Third plaintiffs' lack of reliance on the appraisals is not surprising since neither the developers nor the purchasers of the lots were concerned about the actual value of the founders' lots. The purchase of the lots by the Fifth Third plaintiffs was simply a necessary step in an investment scheme which they believed would guarantee them a quick $125,000 profit. Under the scheme, the profit for the Fifth Third plaintiffs had nothing to do with the value of the lots themselves; all that mattered was the promise in the purchase contract for the developers to (1) pay the interest on the purchase loans and (2) repurchase each lot for $125,000 more than the sales price in one year. Indeed, it is unclear whether the sales of the founders' lots were more accurately characterized as securities transactions, which fall outside the provisions of Chapter 75. *See In re Fifth Third, N.A.*, 217 N.C. App. at 211 n.6, 719 S.E.2d at 179 n.6 ("The fact that the purchase price that [the p]laintiffs paid for the lots in question was identical and bore no apparent relation to the actual value of the relevant lots in their undeveloped state may cut against, instead of in favor of, [the p]laintiffs' position. The fact that each lot was appraised and priced at the same value may suggest that the investments in question amounted to a securities transaction not subject to the UDTP [Act], rather than a loan.") (citations omitted).

N.C. App. at __, 724 S.E.2d at 550. We are utterly unable to distinguish the relevant circumstances here from those presented in the Penland cases, and thus we reach the same result. *See In re Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (holding that "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court"). In light of the Fifth Third plaintiffs' inability to show either misrepresentations or reliance on the allegedly negligent appraisals, the trial court properly granted summary judgment on their UDTP claims. Accordingly, the Fifth Third plaintiffs' UDTP arguments are overruled.

AFFIRMED.

Judges STROUD and MCCULLOUGH concur.