IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-1032

Filed: 19 June 2018

Chatham County, No. 16 CVS 724

SERAFINO "VINCE" CORDARO, Plaintiff,

v.

HARRINGTON BANK, FSB, n/k/a BANK OF NORTH CAROLINA, a North Carolina Bank, Defendant,

and

BANK OF NORTH CAROLINA, Third-Party Plaintiff,

v.

DANNY D. GOODWIN D/B/A DANNY GOODWIN APPRAISALS, Third-Party Defendant.

Appeal by plaintiff from order entered 8 August 2017 by Judge Lindsay R. Davis, Jr. in Chatham County Superior Court. Heard in the Court of Appeals 7 March 2018.

> *Sigmon Law, PLLC, by Mark R. Sigmon, for plaintiff-appellant.*

> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P, by S. Wilson Quick and Reid L. Phillips for defendant-appellee.*

DAVIS, Judge.

In this appeal, we consider the potential liability of a bank for providing an inaccurate appraisal value to its borrower in connection with a residential loan.

Serafino "Vince" Cordaro filed this civil action asserting claims against Harrington Bank[1] ("Harrington") premised upon theories of negligence, negligent misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-1.1. Because we conclude that Cordaro's complaint failed to sufficiently plead justifiable reliance upon the appraisal information at issue or the existence of a contractual duty owed to him by Harrington with regard to the appraisal, we hold that the trial court properly granted Harrington's motion to dismiss.

**Factual and Procedural Background**

We have summarized the pertinent facts below using Plaintiff's own statements from his complaint, which we treat as true in reviewing a trial court's order granting a motion to dismiss. *See, e.g., Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 325, 626 S.E.2d 263, 266 (2006) ("When reviewing a complaint dismissed under Rule 12(b)(6), we treat a plaintiff's factual allegations as true." (citation omitted)).

In 2011, Cordaro purchased a lot in the Governor's Club subdivision of Chapel Hill where he intended to build a home. Cordaro paid $294,500 for the lot. He hired an architect in May 2012 to design the planned residence. His contract with the

---

[1] At some point during the time period relevant to this litigation, Harrington Bank was acquired by Bank of North Carolina.

architect provided that the completed house would consist of approximately 3,000 square feet and cost approximately $800,000 to build.

## I. Loan Application and Construction Appraisal

In November 2012, Cordaro began looking for a lender to provide him with a construction loan that could later be converted into a mortgage once the home was built. He visited Harrington's website and began filling out a loan application online. Prior to completing the application, Cordaro called John MacDonald, a loan officer employed by Harrington, to discuss the potential loan. During this conversation, Cordaro informed MacDonald that if the value contained in Harrington's internal appraisal of the planned home was less than the price he paid for the lot plus the cost of construction then he would not go forward with either the loan or the construction of the house.

Following his discussion with MacDonald, Cordaro signed a construction contract with Brightleaf Development Company ("Brightleaf") on 28 November 2012. The contract listed the total cost to build the house as $835,359. Cordaro and Brightleaf also verbally agreed that if the house was not appraised at a value equal to the cost of the lot plus the cost of construction then the home would not be built and the contract would be void.

On 4 December 2012, Cordaro submitted a loan application to Harrington seeking a loan of $850,000. In connection with the loan application, MacDonald

ordered an appraisal through Community Bank Real Estate Solutions ("CBRES"), an appraisal management company. Along with his request, MacDonald submitted to CBRES Cordaro's construction contract, construction drawings, and the lot's purchase price. An appraiser named Danny Goodwin was assigned by CBRES to appraise Cordaro's prospective residence. On 10 December 2012, Goodwin appraised the home at a value of $1,150,000.

MacDonald emailed Goodwin's appraisal (the "Construction Appraisal") to Cordaro on 12 December 2012. An hour after receiving the Construction Appraisal, Cordaro sent an email to his architect informing him of the appraisal amount and asking him to tell Brightleaf that construction could begin on the home.

On 19 December 2012, MacDonald emailed Cordaro once again, informing him that Harrington's loan committee had approved his loan on the condition that Cordaro put $100,000 in escrow as a cash reserve. Cordaro responded later that day, asking why he was being asked to provide a cash reserve and inquiring whether this requirement was a standard practice of Harrington's. MacDonald replied that the loan committee was concerned about the proposed residence's high cost per square foot. Cordaro then asked MacDonald if he should be concerned about the value of the house. MacDonald responded that there was no reason for concern and told Cordaro that the committee was simply being "overly cautious." Cordaro refused to place

$100,000 in escrow but instead offered to put down $58,000 in cash. Harrington accepted this proposal.

Harrington proceeded to conduct an internal review of the Construction Appraisal. On 21 December 2012, MacDonald signed an appraisal review form stating his belief that the Construction Appraisal was a reasonable estimate of the value of Cordaro's home and that it complied with applicable regulatory requirements. The review form was also signed by a second employee of Harrington on 24 December 2013. Both reviews were required under Harrington's Consumer & Mortgage Loan Policy & Product Manual, which provided that every appraisal received by Harrington "shall be reviewed for conformity with minimum regulatory requirements" and that appraisals "with transactions in excess of $500,000 will receive a secondary review by the Manager of Mortgage Lending."

## II. Construction Loan Agreement

On 29 January 2013, Cordaro submitted a second loan application that was identical in all respects to the first application except that it provided for a decreased loan amount of $777,250. The following day, Cordaro signed a contract (the "Construction Loan Agreement") with Harrington. This agreement contained language stating as follows:

> Appraisal. If required by Lender, an appraisal shall be
> prepared for the Property, at Borrower's expense, which in
> form and substance shall be satisfactory to Lender, in
> Lender's sole discretion, including applicable regulatory

requirements.

Construction began on the house in early 2013. The total acquisition and construction cost of the property was ultimately $1,250,000.

## III. Mortgage Appraisal

As construction neared completion in late 2013, Cordaro began working with MacDonald to refinance his construction loan and receive a permanent mortgage loan from Harrington. Unbeknownst to Cordaro, Harrington planned to provide him with a mortgage loan and then immediately sell the mortgage to Amerisave Mortgage Company ("Amerisave").

In January 2014, Harrington ordered a new appraisal of Cordaro's home for purposes of the mortgage loan. An individual named Luther Misenheimer was assigned to conduct the new appraisal. On 28 January 2014, MacDonald emailed Misenheimer a copy of Goodwin's earlier Construction Appraisal, informing Misenheimer that he should "[c]all if you need additional info." Several hours later, MacDonald emailed Misenheimer again and stated that "[w]e need a BIG number . . . . . . ☺."

Misenheimer ultimately declined to perform the appraisal for Harrington. The appraisal was then reassigned to Goodwin. Goodwin issued his second appraisal (the "Mortgage Appraisal") on 10 February 2014, valuing the property at $1,250,000.

Upon receiving Goodwin's Mortgage Appraisal, Harrington requested that CBRES run the Mortgage Appraisal through the Uniform Collateral Data Portal ("UCDP"), a system that performs independent automated risk assessments of submitted appraisals. CBRES submitted the Mortgage Appraisal to the UCDP on 11 February 2014, and the system flagged ten separate flaws with the appraisal. Among the flaws noted were the fact that (1) Goodwin's valuation of Cordaro's home was "significantly different" than the sale price of a comparable property used by Goodwin in arriving at his valuation; and (2) the three comparable properties utilized by Goodwin in conducting his appraisal were not similarly situated to Cordaro's home.

Also in February 2014, Amerisave commissioned an outside company called Clear Capital to perform a Collateral Desktop Analysis ("CDA") of the Mortgage Appraisal, which was conducted on 18 February 2014. The CDA valued Cordaro's home at $625,000 — exactly one-half the amount of the Mortgage Appraisal. The CDA also highlighted many of the same flaws with the Mortgage Appraisal that were noted by the UCDP.

On 18 February 2014, an Amerisave employee emailed MacDonald to inform him that Amerisave would not buy the loan from Harrington due to the results of the CDA. MacDonald emailed a coworker on 26 February 2014, stating that "I think [Cordaro's] loan is dead but I'm going to restart with another lender tomorrow." The

other lender that MacDonald was referring to in his email was Sierra Pacific Mortgage Company ("Sierra Pacific").

In late February or early March 2014, Cordaro became aware that Harrington intended to sell his mortgage loan to another lender such that third-party approval would be required in order to fund his loan. Nevertheless, Cordaro applied for a new loan from Harrington in the proposed amount of $783,000 on 27 February 2014.

Sierra Pacific hired an appraiser named Jan Faulkner to conduct an appraisal of Cordaro's home. On 10 March 2014, Faulkner valued the property at $800,000. Following Faulkner's appraisal, MacDonald emailed Cordaro new proposed financing terms that consisted of a $600,000 mortgage loan and a $120,000 equity loan. On 21 March 2014, MacDonald emailed Cordaro the results of the CDA that had been commissioned by Amerisave. In the email, MacDonald stated that "[w]e think this appraisal is poor. We fought it and lost."

In mid-April 2014, Harrington informed Cordaro that it could not offer him the permanent mortgage loan of $783,000 for which he had applied and could instead only loan him approximately $600,000. In the meantime, the balloon payment on Cordaro's construction loan was due at the end of the month. Cordaro took out a $600,000 loan from Sierra Pacific and covered the shortfall between the mortgage loan and the amount due on the construction loan balloon payment by selling off

several of his personal investments. On 18 April 2016, an appraiser commissioned by Cordaro valued his property at $765,000.

**IV. Lawsuit**

On 18 October 2016, Cordaro filed a complaint against Harrington in Chatham County Superior Court alleging claims for negligence, negligent misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices. Harrington filed an answer along with a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure on 26 December 2016. Harrington also filed a third-party complaint against Goodwin on 10 February 2017 in which it asserted claims for breach of contract, negligent misrepresentation, indemnity, and contribution.

On 8 August 2017, the Honorable Lindsay R. Davis, Jr. entered an order granting Harrington's motion to dismiss Cordaro's complaint and also dismissing Harrington's third-party complaint against Goodwin as moot. Cordaro filed a timely notice of appeal to this Court.

**Analysis**

Cordaro's sole argument on appeal is that the trial court erred by granting Harrington's motion to dismiss. He contends that he has alleged viable claims for relief based on Harrington's actions in obtaining an appraisal that it should have known contained an inflated valuation of his home. He further asserts that

Harrington was aware of the fact that he was relying upon the result of the appraisal in deciding whether to go forward with the construction of the home and to take out the accompanying loans. Finally, he contends that MacDonald had a conflict of interest in that he was entitled to receive a commission if the loan was completed yet Harrington nevertheless improperly allowed him to participate in the bank's internal review of the Construction Appraisal.[2]

> The standard of review of an order granting a Rule 12(b)(6) motion is whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true. On appeal, we review the pleadings *de novo* to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct.

*Feltman v. City of Wilson*, 238 N.C. App. 246, 251, 767 S.E.2d 615, 619 (2014). "Dismissal is proper when one of the following three conditions is satisfied: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Podrebarac v. Horack, Talley, Pharr, & Lowndes, P.A.*, 231 N.C. App. 70, 74, 752 S.E.2d 661, 663 (2013) (citation omitted).

## I. Negligence-Based Claims

---

[2] Cordaro alleges that MacDonald ultimately received a commission of $5,829 in connection with Harrington's loan to Cordaro.

## A. Negligence

We first consider Cordaro's argument that he successfully stated a claim for negligence. He asserts that Harrington owed him a duty of care arising under either the North Carolina Secure and Fair Enforcement Mortgage Licensing Act[3] (the "SAFE Act") or general common law principles of negligence and that Harrington breached this duty by failing to properly discover and inform him that the appraisal amount was inflated. Cordaro further contends that he "justifiably relied on both the Construction Appraisal and [Harrington's] review and approval of that appraisal, including after [Harrington] asked him to put more money down."

The essential elements of any negligence claim are "the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff." *Harris v. Daimler Chrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) (citation and quotation marks omitted). "[T]he first prerequisite for recovery of damages for injury by negligence is the existence of a legal duty, owed by the defendant to the plaintiff, to use due care. If no duty exists, there logically can be neither breach of duty nor liability." *Id.* (internal citation and quotation marks omitted). Furthermore, "[e]ven if a plaintiff can show circumstances giving rise to a duty . . . , absent a sufficient allegation and showing of justifiable

---

[3] *See* N.C. Gen. Stat. § 53-244.010, *et seq.* (2017).

reliance, a plaintiff's negligence claims fail." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449, 781 S.E.2d 1, 8 (2015) (citation omitted).

As an initial matter, we note that this case does not involve the existence of a fiduciary duty between Cordaro and Harrington. "A fiduciary duty generally arises when one reposes a special confidence in another, and the other in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (citation and quotation marks omitted). Our Supreme Court has made clear that "[o]rdinary borrower-lender transactions . . . are considered arm's length and do not typically give rise to fiduciary duties." *Dallaire v. Bank of Am., N. A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 266 (2014) (citation omitted). Moreover, "the law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own." *Id.* at 368, 760 S.E.2d at 267.

Instead, Cordaro argues that a legal duty existed through the General Assembly's enactment of the SAFE Act. In addition to regulating the licensure status of mortgage lenders, the SAFE Act also imposes certain duties upon them and prohibits them from taking various specified actions in connection with mortgage loans. The Act contains prefatory language stating that its primary purpose "is to protect consumers seeking mortgage loans and to ensure that the mortgage lending industry operates without unfair, deceptive, and fraudulent practices on the part of mortgage loan originators." N.C. Gen. Stat. § 53-244.020 (2017). Cordaro contends

that Harrington violated subsections (1), (8), (11), and (14) of N.C. Gen. Stat. § 53-244.111 — one of the statutes that comprise the SAFE Act. Those subsections provide, in pertinent part, as follows:

> [I]t shall be unlawful for any person in the course of any residential mortgage loan transaction:
>
> (1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.
>
> . . . .
>
> (8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person in connection with the brokering or making or servicing of, or purchase or sale of, any mortgage loan.
>
> . . . .
>
> (11) To improperly influence or attempt to improperly influence the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan. . . .
>
> . . . .
>
> (14) To fail to comply with applicable State and federal laws and regulations related to mortgage lending or mortgage servicing.

N.C. Gen. Stat. § 53-244.111 (2017).

This Court ruled in *Guyton v. FM Lending Servs., Inc.*, 199 N.C. App. 30, 681 S.E.2d 465 (2009), that North Carolina's Mortgage Lending Act[4] — the predecessor statute to the SAFE Act — could serve as the source of a legal duty owed by a lender to a borrower for purposes of a negligence claim. *Id.* at 44, 681 S.E.2d at 476. In that case, the borrowers asserted claims for fraud, negligent misrepresentation, and unfair and deceptive trade practices against their mortgage lender for failing to disclose that their home was located in a flood hazard area. We reversed the trial court's dismissal of the borrowers' claims, stating that "a legal duty of the type claimed by Plaintiffs does exist under the North Carolina Mortgage Lending Act." *Id.* at 36, 681 S.E.2d at 471.

In reaching this conclusion, we examined various provisions of the Act that prohibited certain actions by lenders in connection with mortgage loans. Based on the similarities between the Mortgage Lending Act and the SAFE Act, Cordaro argues that our holding in *Guyton* recognizing the existence of a legal duty under the Mortgage Lending Act applies equally to the SAFE Act.

Even assuming — without deciding — that the SAFE Act can serve as the source of a legal duty owed by a lender to a borrower in the residential loan context, Cordaro is still required to have properly alleged justifiable reliance upon Harrington's actions in order to prevail on his negligence claim. Cordaro contends

---

[4] *See* N.C. Gen. Stat. § 53-243.01, *et seq.*, *repealed by* 2009 N.C. Sess. Laws 374, sec. 1 (effective 31 July 2009).

that his complaint adequately alleged that he justifiably relied upon "both the Construction Appraisal and [Harrington's] review and approval of that appraisal" in signing the Construction Loan Agreement on 30 January 2013. We disagree.

In determining whether Cordaro sufficiently pled justifiable reliance, we find instructive two cases from our appellate courts. *Arnesen* involved nineteen individual investors who decided to invest in undeveloped real estate based upon allegedly faulty appraisal information provided by a bank. *Arnesen*, 368 N.C. at 441, 781 S.E.2d at 3. The investors brought an action against both the bank and its appraisers in which they asserted, *inter alia*, claims for negligence, negligent misrepresentation, fraud, and unfair and deceptive trade practices. *Id.* at 445, 781 S.E.2d at 6. In their complaint, the plaintiffs alleged that "they would not have purchased [the] real property but for [the] faulty appraisal information and that, in any event, the bank should have discovered and disclosed the inflated appraised property values to them." *Id.* at 441, 781 S.E.2d at 3. However, the plaintiffs did not allege that they had reviewed or inquired about the appraisal information prior to making the decision to purchase or that their decision to buy the property was contingent upon the flawed appraisals. *Id.*

Our Supreme Court held that the bank was entitled to dismissal of all claims due to the plaintiffs' failure to sufficiently allege justifiable reliance. The Court explained that "[r]eliance is not reasonable if a plaintiff fails to make any independent

investigation, or fails to demonstrate he was prevented from doing so[.]" *Id.* at 449, 781 S.E.2d at 8 (internal citations and quotation marks omitted). Rather, "to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* at 454, 781 S.E.2d at 11 (citation, quotation marks, brackets, and ellipsis omitted). Consequently, the Supreme Court concluded as follows:

> It is undisputed . . . that plaintiffs decided to purchase the investment properties without consulting an appraisal. Moreover, . . . [p]laintiffs have not alleged that they ordered, viewed, or requested appraisal information at any time, or that they were prevented from doing so.

*Id.* at 448, 781 S.E.2d at 7.

In *Fazarri v. Infinity Partners, LLC*, 235 N.C. App. 233, 762 S.E.2d 237 (2014), a group of real estate investors brought claims for negligence and negligent misrepresentation against their lenders. *Id.* at 235, 762 S.E.2d at 239. The plaintiffs purchased individual lots as part of a real estate development plan that were all identically appraised at $500,000 — regardless of the lot's specific characteristics or location. The plaintiffs alleged that, in actuality, the true value of the lots "ranged from $40,000-$81,000." *Id.* at 235, 762 S.E.2d at 238. This Court upheld the trial court's grant of summary judgment for the lenders on the ground that the plaintiffs

"forecast no evidence that they undertook their own independent inquiries into the value of the lots (such as obtaining their own independent appraisals) or were prevented from doing so." *Id.* at 241, 762 S.E.2d at 242. Therefore, we concluded that the plaintiffs could not demonstrate justifiable reliance. *Id.*

While we are mindful of the fact that we must accept all of Cordaro's allegations as true for purposes of this appeal from the trial court's Rule 12(b)(6) order, his allegations fail to satisfy the requirement of justifiable reliance.[5] Prior to completing a loan application with Harrington, Cordaro had already purchased a lot in the Governor's Club subdivision, hired an architect, and signed a construction contract with a builder. Within an hour of receiving the Construction Appraisal from MacDonald, Cordaro took steps to inform his builder that construction could begin on the house. Furthermore, he made no additional inquiries to anyone other than MacDonald to confirm the accuracy of Goodwin's Construction Appraisal prior to signing the Construction Loan Agreement on 30 January 2013. In short, the allegations in his complaint fail to show that he either engaged in any type of independent inquiry as to the validity of the appraisal value or that he was in any way prevented from doing so.

Cordaro contends that the present case is distinguishable from *Arnesen* and *Fazarri* because he — unlike the plaintiffs in those cases — has alleged that he

---

[5] We note that *Arnesen* — like the present case — involved an appeal from a trial court's dismissal of a complaint under Rule 12(b)(6).

actually did rely upon the Construction Appraisal in entering into the Construction Loan Agreement. It is true that the *Arnesen* and *Fazarri* plaintiffs did not allege their decisions to purchase the properties at issue in those cases were contingent upon their review of their lenders' appraisals. Nevertheless, both cases make clear that in order to demonstrate justifiable reliance Cordaro was required to allege either that he undertook his own independent inquiry regarding the validity of the Construction Appraisal or that he was somehow prevented from doing so. For this reason, we hold that the trial court did not err in dismissing his negligence claim.[6]

**B. Negligent Misrepresentation**

It is well established that "the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." *Walker v. Town of Stoneville*, 211 N.C. App. 24, 30, 712 S.E.2d 239, 244 (2011) (citations, quotation marks, and brackets omitted). Having already determined that the allegations in Cordaro's complaint failed to demonstrate justifiable reliance, we likewise hold that this same defect bars his negligent misrepresentation claim.

**C. Negligent Supervision**

In his appellate brief, Cordaro further contends that the trial court erred in

---

[6] In light of our ruling that Cordaro has failed to plead facts supporting the existence of justifiable reliance, we need not address Cordaro's alternative argument that Harrington breached a duty it owed to him under common law principles of negligence.

dismissing his claim against Harrington for negligent supervision of MacDonald. However, Cordaro did not assert such a claim in his complaint. Although North Carolina recognizes the doctrine of notice pleading, *see Haynie v. Cobb*, 207 N.C. App. 143, 148-49, 698 S.E.2d 194, 198 (2010), a plaintiff is still required to expressly allege in his complaint the specific claims for relief that it is asserting against the defendant. *See Curl v. Am. Multimedia, Inc.*, 187 N.C. App. 649, 656, 654 S.E.2d 76, 81 (2007) ("[N]one of the three causes of action proposed by Plaintiffs were asserted in their complaint. . . . This Court has long held that issues and theories of a case not raised below will not be considered on appeal." (citations, quotation marks, and brackets omitted)). Accordingly, we do not consider Cordaro's arguments as to negligent supervision.

## II. Contract-Based Claims

### A. Breach of Contract

In addition to asserting claims grounded in negligence, Cordaro's complaint also contains two contract-based claims. Primarily, Cordaro contends that Harrington "breached the Construction Loan Agreement in failing to ensure that the Construction Appraisal complied with [the Uniform Standards of Professional Appraisal Practice] and various other state and federal appraisal requirements."

The elements of a claim for breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." *Johnson v. Colonial Life &*

*Accident Ins. Co.*, 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005) (citation and quotation marks omitted). "[W]here the complaint alleges each of these elements, it is error to dismiss a breach of contract claim under Rule 12(b)(6)." *Woolard v. Davenport*, 166 N.C. App. 129, 134, 601 S.E.2d 319, 322 (2004) (citation omitted).

Cordaro's breach of contract claim is based upon the following provision contained in the Construction Loan Agreement:

> Appraisal. If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

Harrington asserts that this language did not create any contractual duty on its part toward Cordaro. We agree.

By the plain terms of this provision of the Construction Loan Agreement, the preparation of any appraisal was for the sole benefit of Harrington. Moreover, the contractual language further provided that any appraisal prepared "shall be satisfactory to Lender, in Lender's sole discretion[.]" This language reinforces the notion that Harrington was under no contractual obligation to Cordaro to ensure the accuracy of the Construction Appraisal. Rather, any appraisal commissioned by Harrington was entirely for its own internal use.[7]

---

[7] Cordaro contends that the phrase "including applicable regulatory requirements" supports his argument on this issue. However, while the precise meaning of this phrase in the context of this contractual provision is unclear, its inclusion does not alter the fact that the document is devoid of

For these reasons, we conclude that Cordaro's breach of contract claim fails as a matter of law. Therefore, it was properly dismissed by the trial court.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

The invalidity of Cordaro's breach of contract claim on these facts is likewise fatal to his claim for breach of the implied covenant of good faith and fair dealing. Under North Carolina law, every contract contains "an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation and quotation marks omitted). *See Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) ("In addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms." (citation and quotation marks omitted)).

As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as "part and parcel" of the latter. *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996), *disc. review denied*, 345 N.C. 344, 483 S.E.2d 172-73 (1997); *see Suntrust Bank v. Bryant/Sutphin Props., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 ("As the

---

language conferring upon Harrington any contractual obligation to Cordaro with respect to appraisals required by the bank.

jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts."), *disc. review denied*, 366 N.C. 417, 735 S.E.2d 180 (2012).

Here, the basis for Cordaro's claim that Harrington breached the implied covenant of good faith and fair dealing is identical to the basis for his breach of contract claim. Therefore, the trial court properly dismissed this claim as well.

### III. Unfair and Deceptive Trade Practices Claim

Finally, Cordaro argues that the trial court erred in granting Harrington's motion to dismiss his unfair and deceptive trade practices claim pursuant to Chapter 75 of the North Carolina General Statutes. Once again, we disagree.

N.C. Gen. Stat. § 75-1.1 provides, in relevant part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2017). It is well established that "[a] claim of unfair and deceptive trade practices under section 75-1.1 of the North Carolina General Statutes requires proof of three elements: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 738, 659 S.E.2d 483, 488 (2008) (citation omitted). Our Supreme Court has held that "a claim under section 75-1.1 stemming from an alleged

misrepresentation . . . require[s] a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013).

> We previously likened such burden of proof to that of the detrimental reliance requirement under a fraud claim. In making this inquiry we examine the mental state of the plaintiff. Two key elements specific to the plaintiff combine to determine detrimental reliance: (1) actual reliance and (2) reasonable reliance.

*Id.* at 89, 747 S.E.2d at 227 (internal citation and quotation marks omitted).

As discussed above, Cordaro has failed to sufficiently allege that he reasonably relied on the Construction Appraisal. Therefore, he cannot satisfy the elements of a claim under N.C. Gen. Stat. § 75-1.1. Accordingly, the trial court did not err in dismissing this claim.

### Conclusion

For the reasons stated above, we affirm the trial court's 8 August 2017 order.

AFFIRMED.

Judges STROUD and BERGER concur.