**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| M. SCOTT HARRIS, M.D., and MIDDLEBURG CONSULTANTS INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. N19C-01-055 RRC |
| v. | ) ) | |
| INNOVATE BIOPHARMACEUTICALS, INC., a Delaware Corporation, | ) ) ) | |
| Defendant. | ) ) ) ) | |

Submitted: July 26, 2019
Decided: October 15, 2019

On Defendant Innovate Biopharmaceuticals, Inc.'s Motion to Dismiss.
**GRANTED.**

## MEMORANDUM OPINION

David W. deBruin, Esquire, Gawthrop Greenwood, PC, Wilmington, Delaware, and Jarod Bona, Esquire and Steven Levitsky, Esquire, Bona Law PC, New York, New York, Attorneys for Plaintiffs M. Scott Harris, M.D. and Middleburg Consultants, Inc..

Catherine A. Gaul, Esquire, Ashby & Geddes, Wilmington, Delaware, Attorney for Defendant Innovate Biopharmaceuticals, Inc..

COOCH, R.J.

### I. INTRODUCTION[1]

---

[1] The Introduction, Facts and Procedural History, and the Parties' Contentions are derived from the parties' joint stipulation. *See* Exhibit to Letter to the Court at 2–9, *Harris v. Innovate*, N19C-01-055, D.I. 14 (July 26, 2019) (hereinafter Joint Stipulation).

1

This is Innovate Biopharmaceuticals, Inc.'s ("Defendant") Motion to Dismiss the complaint filed by Plaintiffs, M. Scott Harris, M.D. and Middleburg Consultants Inc. Plaintiffs in the complaint assert claims for breach of contract (Counts I and II), negligent misrepresentation (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), and fraud (Count V). Defendant argues that the complaint should be dismissed for failure to state any claims for which relief can be granted.

After review of the parties' contentions and the record, the Court concludes that Plaintiffs have failed to sufficiently assert claims upon which relief can be granted.[2] Plaintiffs sought to impose duties upon Defendant that were not contemplated by the plain language of the relevant contracts. The Consulting Agreement expressly contemplated delay in completion of an Initial Public Offering (IPO), provided consideration for such delay, and obligated Defendant to deliver unrestricted shares to Plaintiff after Plaintiff exercised the stock options. These terms have been satisfied by Defendant. Defendant rendered compensation for the delay and delivered the unrestricted shares two weeks after Plaintiff exercised the stock options at issue. Further, the undisputed facts do not reflect any instances of fraud.

## II. FACTS AND PROCEDURAL HISTORY

*A. The Parties.*

Innovate is a Delaware corporation with its principal place of business in Raleigh, North Carolina. It is a clinical stage biotechnology company that focuses on developing novel medicines for autoimmune and inflammatory diseases. (Compl. ¶ 3).

Harris is a resident of Maryland who entered into a Consulting Agreement with Innovate through his privately held company, Middleburg Consultants, which is a Maryland corporation. (Compl. ¶ 2, 7).

*B. The Consulting Agreement.*

On or about August 29, 2016, Harris and Innovate entered into a Consulting Agreement. Under the Consulting Agreement, Harris "agreed to provide Innovate regulatory guidance on Innovate's therapeutic programs, participate in regulatory and development strategy discussions with the company, review regulatory documents, and participate in due diligence calls with investors or strategic partners of the company." (Compl. ¶ 7).

---

[2] The parties have agreed that North Carolina law applies.

In exchange for providing these services, the Consulting Agreement provides that "[t]he Company shall pay Consultant, and Consultant hereby agrees to accept, as compensation for all services to be rendered to the Company, the compensation set forth in this Section 3." (Motion Ex. A § 3). Under Section 3.1, entitled "Stock Options," the agreement provides:

The Company will issue Consultant options equivalent to 0.5% of the Company on a fully diluted basis as of Sept 13, 2016. The strike price will be set at the next round of financing of the Company, but is expected to be $0.83 per share, but is subject to change. The initial 40% of the shares will vest immediately: with the remaining 60% will vest upon completion of the End of Phase 2 meeting with the US FDA for INN-202, Larazotide Acetate. The option exercise period will be 4 years after the expiration or termination of this Agreement. If the Company has not completed an underwritten initial public offering by June 30, 2017, the Company will make a one-time payment of $15,000 (fifteen thousand US dollars) to Consultant in consideration of the delay to asset liquidity on public markets.

(Motion Ex. A § 3.1; see also Compl. ¶¶ 12-16).

*C. The Stock Option Grant and Related Agreements.*

On March 21, 2017, Innovate granted Harris an option to purchase 232,725 shares of Innovate common stock at an exercise price per share of $0.785 pursuant to the Notice of Nonstatutory Stock Option 2015 Stock Incentive Plan (the "Option Notice"). (Compl. ¶ 18; see also Motion Ex. B). The shares fully vested on the grant date. (Id.). The Option Notice indicates that the "stock option is granted under and governed by the terms and conditions of the Plan and the accompanying Nonstatutory Stock Option Agreement, both of which are incorporated herein by reference." A copy of Innovate's 2015 Stock Incentive Plan (the "Plan") is attached hereto as Exhibit C.

The Stock Option Notice and the Nonstatutory Stock Option Agreement Granted Under 2015 Stock Incentive Plan (the "Option Agreement") contains the following statement in bold at the top of the agreement:

**THE OPTION GRANTED PURSUANT TO THIS AGREEMENT AND THE SHARES ISSUABLE UPON THE EXERCISE THEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR APPLICABLE LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.**

(Motion Ex. B Preamble (emphasis and capitalization in original)).

Section 1 of the Option Agreement states that it:

evidences the grant by Innovate Biopharmaceuticals Inc., a Delaware corporation (the "Company"), on the Grant Date to the Participant, a consultant/advisor of the Company, of

3

an option to purchase, in whole or in part, on the terms provided herein and in the Plan, the Total Number of Shares of Common Stock at the Exercise Price Per Share, all as defined and set forth in the accompanying Notice of Nonstatutory Stock Option (the "Notice").

(Motion Ex. B § 1).

Section 9 of the Option Agreement, entitled "Entire Agreement; Governing Law," provides:

The Plan and the Notice are incorporated herein by reference. This Agreement, the Notice and the Plan constitute the entire agreement between the Company and the Participant with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Participant with respect to the subject matter hereof. This Agreement shall be governed by and construed in accordance with the General Corporation Law of the State of Delaware, as to matters within the scope thereof, and the internal laws of the State of North Carolina (without reference to conflict of law provisions), as to all other matters.

(Motion Ex. B § 9).

Exhibit A to the Option Agreement, prepared by Innovate, contains the form of notice that Harris would need to execute in order to exercise his option. (See Motion Ex. B at Exhibit A). Included with that notice are certain representations and warranties that would be made by the Participant upon exercise, including in pertinent part:

4.      I can afford a complete loss of the value of the Shares and am able to bear the economic risk of holding such Shares for an indefinite period.

5.      I acknowledge that I am acquiring the Shares subject to all other terms of the Plan, including the Notice of Nonstatutory Stock Option and related Nonstatutory Stock Option Agreement.

* * *

8.      I understand that (i) the Shares have not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act, (ii) the Shares cannot be sold, transferred or otherwise disposed of unless they are subsequently registered under the Securities Act or an exemption from registration is then available; (iii) in any event, the exemption from registration under Rule 144 will not be available for at least six months or one year (depending on whether the Company is subject to the reporting obligations of the Securities Exchange Act of 1934, as amended) and even then will not be available unless applicable terms and conditions of Rule 144 are complied with; and (iv) there is now no registration statement on file with the Securities and Exchange Commission with respect to any stock of the Company and the Company has no obligation or current intention to register the Shares under the Securities Act.

(Motion Ex. B at Exhibit A ¶¶ 4, 5, 8; Compl. ¶ 50).

Section 5(e) of Innovate's 2015 Stock Incentive Plan (the "Plan") states:

4

Exercise of Option. Options may be exercised by delivery to the Company of a written notice of exercise signed by the proper person ... together with payment in full as specified in Section 5(f) for the number of shares of Common Stock for which the Option is exercised. Shares of Common Stock subject to the Option will be delivered by the Company following exercise either as soon as practicable or, subject to such conditions as the Board shall specify, on a deferred basis. . . .

(Motion Ex. C § 5(e)).

Section 9(g) of the Plan, entitled "Conditions on Delivery of Stock," states:

The Company will not be obligated to deliver any shares of Common Stock pursuant to the Plan or to remove restrictions from shares previously delivered under the Plan until: (i) all conditions of the Award have been met or removed to the satisfaction of the Company; (ii) in the opinion of the Company's counsel, all other legal matters in connection with the issuance and delivery of such shares have been satisfied, including any applicable securities laws and any applicable stock exchange or stock market rules and regulations; and (iii) the Participant has executed and delivered to the Company such representations or agreements as the Company may con-sider appropriate to satisfy the requirements of any applicable laws, rules, regulations or contracts of the Company.

(Motion Ex. C § 9(g); Compl. ¶ 11).

*D. Innovate Becomes Publicly Traded and Harris Receives $15,000 under the Consulting Agreement.*

At the time Harris entered into the Consulting Agreement and the Option Agreement, Innovate was not a public company and its stock was not publicly traded. (Compl. ¶11). While Innovate initially contemplated undertaking an initial private offering ("IPO") in order for its stock to become publicly listed, it ultimately determined that it would be faster and less expensive to enter into a reverse merger with Monster Digital, Inc. ("Monster"), a company that was already publicly traded on NASDAQ, rather than underwriting an IPO. (*See* Compl. ¶¶ 24-27).

Because Innovate did not complete an IPO by June 30, 2017, Section 3.1 of the Consulting Agreement required payment of $15,000 to Harris as consideration for "the delay to asset liquidity on public markets." (Compl. ¶¶ 15, 16, 30; Motion Ex. A § 3.1). Harris acknowledges that Innovate paid him the $15,000 he was owed. (See Compl. ¶¶ 31-32).

The reverse merger agreement between Innovate and Monster was entered into on July 3, 2017. (Compl. ¶ 28). The merger did not close until January 29, 2018. (Compl. ¶ 33). Shares of the merged Innovate began publicly trading on February 1, 2018. (Compl. ¶ 35).

Section 5.6(b) of the merger agreement provided that the company "shall file with the SEC, no later than ten (10) calendar days after the Effective Time, a registration statement on Form S-8, if available for use by Monster, relating to the

shares of Monster Common Stock issuable with respect to Innovate Options assumed by Monster...." (Compl. ¶ 29; Motion Ex. D § 5.6(b)).

The merger agreement also provides that there are no third party beneficiaries:

10.7 Assignability; No Third Party Beneficiaries. This Agreement shall be binding upon, and shall be enforceable by and inure solely to the benefit of, the Parties hereto and their respective successors and assigns.... Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the parties hereto...) any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(Motion Ex. D § 10.7).

On March 14, 2018, Innovate filed a Form S-3 Registration Statement/Prospectus covering up to $175,000,000 of new common stock proposed to be issued, as well as the re-sale of 13,990,403 shares of common stock held by pre-existing investors. (Compl. ¶ 55). The Form S-3 filed with the SEC was amended three times and declared effective on July 13, 2018. (Compl. ¶ 56). The Form S-3 indicates that the shares being registered were part of an equity issuance by Innovate prior to the close of the merger that raised gross proceeds of $18,132,660.50.

*E. Harris Exercises His Option.*

On April 24, 2018, Innovate informed Harris about his recalculated option terms resulting from the reverse merger. (Compl. ¶ 39). Harris alleges that he started communicating with Innovate in May 2018 about his desire to exercise his options. (Compl. ¶ 45).

Harris exercised his option under the Option Agreement on October 2, 2018, paying $182,428.48 for 87,706 shares of Innovate common stock. (Compl. ¶ 90). On or about October 15, 2018, Innovate delivered the shares of Innovate common stock to Harris with the restrictive legend removed. (See Compl. ¶ 91). Over the following weeks, Harris sold all of his Innovate shares for total proceeds of $378,359.81. (See Compl. ¶¶ 91-92).

*F. Harris or his Representatives Repeatedly Ask Innovate How the Shares Could be Made Marketable.*

As alleged in the Complaint, beginning in May 2018, Harris repeatedly communicated with an Innovate senior executive, and repeatedly asked how he, Harris, could sell the shares. (Compl. ¶¶ 46-47).

On May 17, 2018, an Innovate senior executive told Harris that that an SEC Form S-8 filing was required before he could sell his stock and that the filing of the Form S-8 must be preceded by the filing of an SEC Form S-3, which was still pending. (Compl. ¶ 47).

6

Throughout June, July, and August 2018, as Innovate's stock price continued to slide, Harris, or his representatives, continued to repeatedly ask Innovate how he could sell his shares. On behalf of Harris, Merrill Lynch repeatedly called and emailed an Innovate senior executive to ask the senior executive specifically about the Rule 144 exemption. On June 26, 2018, the senior executive replied, incorrectly informing Merrill Lynch that:

He [Dr. Harris] would not be able to exercise and sell the options until after Innovate files an S-8 registration and then that is approved by the SEC. I do not have a timeframe as to when this would occur.

(Compl. ¶¶ 53-54).

On August 7, 2018, the senior Innovate executive informed Harris that "I am not legally able to offer any advice or provide any advance notice on our SEC filings. Please contact Steve Laumas, copied, with any further communications." (Compl. ¶¶ 64).

In August 2018, Harris hired a lawyer who wrote a demand letter to Innovate (Compl. ¶¶ 66-67).

Innovate specifically asked Wilson Sonsini, who acted as legal counsel to Innovate on the merger, to respond to Harris' lawyer. (Compl. ¶¶ 68-69).

During a call between Wilson Sonsini, Innovate's counsel, and Harris's lawyer, on September 11, 2018, they discussed the availability of Rules 701 and 144, which, under certain conditions, would allow Dr. Harris to remove the restrictions on Innovate stock and sell his shares. (Compl. ¶¶ 66, 71).

Wilson Sonsini is an extremely sophisticated law firm with extensive and widely-recognized expertise in corporate and securities law, including exemptions for re-sales of stock issued pursuant to the Rule 701 exemption. (Compl. ¶ 79).

The Wilson Sonsini lawyer asked for a "day or two" to examine the availability of possible exemptions. Two weeks later, and despite repeated requests by Dr. Harris's counsel, Wilson Sonsini had still not delivered either the opinion letter and apparently had not even reached a conclusion about the opinion letter. (Compl. ¶¶ 77-78).

On September 26, 2018, or more than two weeks after the first counsel-to-counsel call, the Wilson Sonsini lawyer wrote via email:

Apologies for my delay in getting back to you. After discussing this matter with our client, it's been determined that it is more appropriate and best for local company counsel for Innovate Biopharmaceutical, Inc. (INNT) to review the facts regarding the option grant to Dr. Harris, and consider if they would opine on Dr. Harris's sale of such shares after

7

exercise pursuant to Rule 701(g)(3) and Rule 144.

(Compl. ¶ 80).

*G. Innovate's Legal Counsel Provides the Required Opinion that the Shares Would Be Exempt from Registration*

Innovate's local counsel was Hutchison PLLC in Raleigh, North Carolina. It took the Hutchinson law firm less than two days to conclude they could issue the standard opinion letter to Innovate's transfer agent that the exemptions under Rules 701 and 144 would apply to Dr. Harris, that the legend could be removed from the shares, and that the shares would be marketable. (Compl. ¶¶ 81, 84-85).

Innovate's counsel provided the foregoing draft legal opinion before Harris exercised his options. (Compl. ¶¶ 83, 90).

*H. Innovate Stock Price.*

On April 3, 2018, the Innovate stock price was $46 per share (Compl. ¶ 40); on April 24, 2018, the date Innovate gave Dr. Harris his revised option figures, Innovate's closing stock price was $19.48 (Compl. ¶ 41); on July 11, 2018, the Innovate stock price was $24.18 (Compl. ¶ 63); on July 16, 2018, Innovate stock fell from $23.70 per share to just over $8 per share (Compl. ¶ 59); on October 15, 2018, the Innovate stock price was $5.40 (¶91); on November 7, 2018, the Innovate stock price was $4 (Compl. ¶ 91); and on November 14, 2018, the Innovate stock price was $3.46 (Compl. ¶ 91).

*I. Harris Files This Action and Defendant Moves to Dismiss.*

On January 8, 2019, Harris filed this action against Innovate asserting claims for breach of the Consulting Agreement (First Cause of Action), breach of the Option Agreement and Plan (Second Cause of Action), negligent misrepresentation (Third Cause of Action), breach of the implied covenant of good faith and fair dealing (Fourth Cause of Action), and fraud (Fifth Cause of Action). (D.I. 1). Innovate agreed to accept service and respond to the Complaint by February 25, 2019. (See D.I. 2).

On February 25, 2019, Innovate file a motion to dismiss the Complaint pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted and Superior Court Civil Rule 12(b)(1) for lack of subject matter jurisdiction over the negligent misrepresentation claim.

Harris has agreed to withdraw his First Cause of Action for breach of the Consulting Agreement and his Third Cause of Action for negligent misrepresentation.

# III. THE PARTIES' CONTENTIONS

## A. Defendant's Contentions

Defendant contends that Harris has failed to state any claims for breach of contract given that (i) the Consulting Agreement expressly contemplated that Innovate might not complete an IPO by a date certain in which case Harris was only owed $15,000 (which was paid), and (ii) Innovate was only required to deliver unrestricted shares to Harris under the Plan after he exercised his option, which the company did within two weeks of such exercise. Defendant also contends that Harris improperly seeks to use a phrase from the Consulting Agreement out of context to imply terms in the Option Agreement and Plan in order to claim that Innovate was required to make Harris's shares publicly tradeable prior to any exercise of the options. The unwritten terms Harris seeks to impose, however, are directly contradicted by the express terms of the Option Agreement and Plan, which are separate agreements from the Consulting Agreement. Because Innovate satisfied the express terms of the agreements at issue and Harris received the benefit of his bargain, there was no breach and Harris's contract claims fail as a matter of law.

Defendant contends that Harris's claim for breach of the implied covenant of good faith and fair dealing is deficient because (i) an implied covenant claim should not be considered separate from the breach of contract claim where, as here, a plaintiff alleges the same underlying facts in support of the breach of contract claim, (ii) a party cannot breach the covenant of good faith and fair dealing if there has been no breach of the underlying contract, and (iii) the implied covenant cannot be used to override the express terms of an agreement. Because Harris's implied covenant claim violates each of these principles, it fails as a matter of law.

Finally, Defendant contends that Harris has failed to state a claim for fraud given that (i) the economic loss rule bars tort claims when the alleged damage is to the subject matter of the parties' underlying contract and the plaintiff cannot identify any separate and distinct legal duty apart from the duty created by the parties' contract, and (ii) Harris cannot allege justifiable reliance on any alleged misrepresentations given Harris's failure to investigate or allege that he was prevented from investigating Innovate's statements.

## B. Plaintiffs' Contentions

Plaintiff contends that the Consulting Agreement specifically contemplated "asset liquidity to public markets" as a goal of the Agreement; and that the $15,000 payment was compensation exclusively for the delay but did not eliminate the understanding of the parties that the shares offered through options were meant and understood by the parties to be made marketable.

9

Plaintiff contends that the Nonstatutory Stock Option Agreement (Ex. B) and the Notice of Stock Option Exercise (Ex. A, to Ex. B) separately specifically contemplated the marketability of the shares subject to the options (subject only to the legitimate qualifications contained in those documents).

Plaintiff contends that Exhibit A to the Option Agreement, prepared by Innovate, was fraudulent and materially misleading because it stated (in part) that "(iii) in any event, the exemption from registration under Rule 144 will not be available for at least six months or one year (depending on whether the Company is subject to the reporting obligations of the Securities Exchange Act of 1934, as amended) and even then will not be available unless applicable terms and conditions of Rule 144 are complied with . . . ."

Plaintiff contends that the Rule 144/701(3)(g) option to remove the restrictive legend and make the shares marketable was, as regards Harris, fully available at least as early as February 1, 2018, the first day of trading in Innovate stock; available throughout the period covered by the complaint; and that there was no legitimate reason for Innovate to delay removing the restrictive legend until October 2018.

Plaintiff contends that he had no obligation to independently verify the truth of Innovate's representations in the legal documents it prepared, including the Stock Option Plan, and that he justifiably relied on those representations.

Plaintiff contends that he fully satisfied as the requirements of Section 9(g) of the 2015 Innovate Stock Incentive Plan (Ex. C).

Plaintiff contends that he or his representatives at Merrill Lynch repeatedly asked senior executives at Innovate how he could make his options shares marketable and was repeatedly told, falsely, that an SEC S-8 filing was required before they could be made marketable.

Plaintiff contends that the acts of misrepresentation and delay, recited in the complaint, and specifically the false statements about the shares not being marketable without an S-8 filing, intentionally prevented Harris from selling the shares when all the conditions for an exemption from registration existed.

Plaintiff contends that as a result of these false statements and delays, he lost economic opportunities that would have been available to him had Innovate agreed to remove the restrictive legend as soon as Harris asked how he could market his shares.

Plaintiff contends that Innovate's actions were taken in bad faith and violated the implied covenant of good faith and fair dealing, in that they subverted his legal rights, were fraudulent, arbitrary, and unreasonable, and frustrated the fruits of the bargain that the Harris was reasonably entitled to expect.

10

Plaintiff contends that he had no obligation to exercise his options before determining whether the shares would be marketable because, without knowing how much they could be sold for, he could not be sure that the option exercise price would not be more than the market value.

## IV. STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6) the Court "(i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[3] Although Rule 12(b)(6) permits some leniency, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[4]

## V. DISCUSSION

*Under the terms of the parties' agreements, Plaintiff has no claim to the relief sought.*

Plaintiff has failed to state any claim upon for which relief can be granted. The Complaint must be dismissed pursuant to Superior Court Civil Rule 12(b)(6).[5] Despite Plaintiff's contention that the Consulting Agreement specifically contemplated "asset liquidity to public market," the Consulting Agreement expressly contemplated that Innovate might not complete an IPO by a date certain in which case Harris was only owed $15,000. Here, Innovate paid the $15,000. Furthermore, despite Plaintiff's contention that there was no legitimate reason for Innovate to delay removing the restrictive legend until October 2018, Innovate was only required to deliver unrestricted shares to Harris under the Plan after he exercised his option, which the company did within two weeks of such exercise. Since Defendant has satisfied the express terms of the agreements at issue and Plaintiff received the benefit of his bargain, there was no breach and Plaintiff's contract claims fail as a matter of law.

---

[3] *Turf Nation, Inc. v. UBU Sports, Inc.*, 2017 WL 4535970, at *5 (Del. Super. Ct. Oct. 11, 2017) (citing *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011)).

[4] *Id.* (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[5] Super. Ct. Civ. R. 12(b)(6).

Concerning Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, this Court finds this claim to be deficient and to fail as a matter of law. An implied covenant claim should not be considered separate from the breach of contract claim where, as here, a plaintiff alleges the same underlying facts in support of the breach of contract claim.[6] Additionally, a party cannot breach the covenant of good faith and fair dealing if there has been no breach of the underlying contract.[7] Last, the implied covenant cannot be used to override the express terms of an agreement.[8] Since Plaintiff's implied covenant claim violates each of these principles, it fails as a matter of law.

Finally, Plaintiff has failed to state a claim for fraud given that (i) the economic loss rule bars tort claims when the alleged damage is to the subject matter of the parties' underlying contract and the plaintiff cannot identify any separate and distinct legal duty apart from the duty created by the parties' contract,[9] and (ii) Plaintiff's cannot allege justifiable reliance on any alleged misrepresentations given Plaintiff's failure to investigate or allege that he was prevented from investigating Defendant's statements. Although Plaintiff contends that he had no obligation to independently verify the representations made by Innovate and that Innovate's actions subverted his legal rights and unreasonably frustrated the fruits of the bargain that Plaintiff expected, Plaintiff was entitled to seek independent legal counsel and was not prevented from doing so at any stage. Even though Plaintiff asserts that Innovate should have removed the restrictive legend at the moment that Plaintiff

---

[6] *See Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247 at 256 ("As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as 'part and parcel' of the latter.").

[7] *See Sheth v. Harlan Fin. Solutions, Inc.*, 2014 WL 4783017, at *1 (Del. Super. Ct. Aug. 28, 2014) (dismissing an implied covenant claim where an agreement between the parties governed the dispute); *see also McDonald v. Bank of N.Y. Mellon Trust Co., Natl. Assoc.*, 816 S.E.2d 861, 864-65 (N.C. Ct. App. 2018) ("defendant cannot breach a covenant of good faith and fair dealing when a claimant fails to establish the defendant breached the underlying contract.").

[8] *JTG Equip. & Supply, LLC v. eBay, Inc.*, 2015 WL 303589, at *5 (N.C. Super. Ct. Jan. 23, 2015). (NC Court stating it "will not apply an implied covenant of good faith and fair dealing to override the express terms of a contract.").

[9] *See Rountree v. Chowan Cty.*, 796 S.E.2d 827, 830 (N.C. Ct. App. 2017) (quoting *Lord v. Customized Consulting Specialty, Inc.*, 643 S.E.2d 28, 30-31 (N.C. Ct. App. 2007)) (internal quotations omitted); *see also Forest2Market, Inc. v. Arcogent, Inc.*, 2016 WL 56279, at *3 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Spillman v. Am. Homes of Mocksville, Inc.*, 422 S.E.2d 740, 741-742 (N.C. Ct. App. 1992)) ("[A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.").

12

asked how Plaintiff could market his shares, Innovate's sole obligation was to deliver unrestricted shares to Plaintiff under the Plan after he exercised his option. Innovate satisfied this obligation by delivering the unrestricted shares within two weeks of Plaintiff's exercise of Plaintiff's stock options.

## VI. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED.**

_____
Richard R. Cooch, R.J.

cc:    Prothonotary

13