iTi Commc'ns, LLC v. Seamon, Whiteside, & Assocs., Inc., 2025 NCBC 58.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ITI COMMUNICATIONS, LLC,

Plaintiff,

v.

SEAMON, WHITESIDE, and
ASSOCIATES, INC.,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV050340-590

**ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS,
PLAINTIFF'S MOTION TO STRIKE,
AND
DEFENDANT'S MOTION TO
SUPPLEMENT**

1.      **THIS MATTER** is before the Court on Plaintiff iTi Communications, LLC's Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure (the Rule 12(c) Motion), (ECF No. 16), Plaintiff's Motion to Strike Defendant's Sur-Reply Brief (the Motion to Strike), (ECF No. 23), and Defendant's Motion to Supplement Pleadings (the Motion to Supplement), (ECF No. 28).

2.      The parties in this case entered into commercial contracts by which Defendant Seamon, Whiteside, and Associates, Inc. ("Seamon Whiteside") agreed to provide certain information technology services and equipment to Plaintiff, iTi Communications, LLC ("iTi").  After Seamon Whiteside terminated the arrangement early and iTi assessed contractual Early Termination Fees, Seamon Whiteside discovered what it alleges was a failure on the part of iTi to provide the contracted services for months prior to Seamon Whiteside's decision to terminate.  Both parties sue for breach of contract.

3. iTi filed the Rule 12(c) Motion seeking judgment in its favor both on its claim for breach of contract and on Seamon Whiteside's counterclaims for breach of contract, negligence, and conversion. It also sought to strike what it contends was an improper sur-reply brief. After a hearing on those Motions, Seamon Whiteside sought leave of the Court to supplement its Answer with additional exhibits.

4. The Court, having considered the Motions, the briefs, the arguments of counsel at a hearing on the Rule 12(c) Motion and the Motion to Strike,[1] and other relevant matters of record, concludes for the reasons stated below that the Motion to Supplement shall be **GRANTED**, the Rule 12(c) Motion shall be **GRANTED** in part and **DENIED** in part, and the Motion to Strike shall be **GRANTED**.

*Hamilton Stephens Steele + Martin, PLLC, by Michael Aaron Lay, Graham Bryce Morgan, Devin Honbarger, Zachary Perhach, and John M. Spencer, for Plaintiff iTi Communications, LLC.*

*Gallivan, White, & Boyd, P.A., by Christopher Mark Kelly; and Cipriani & Werner, P.C., by Jason J. Cervone, for Defendant Seamon, Whiteside, and Associates, Inc.*

Earp, Judge.

## I. FACTUAL BACKGROUND

5. On a motion for judgment on the pleadings, the Court does not find facts but rather recites the facts alleged in the pleadings that are relevant to the Court's determination of the motion. *Lane v. Griswold*, 273 N.C. 1, 7, 12 (1968) (quoting *Erickson v. Starling*, 235 N.C. 643, 657 (1952)).

---

[1] Pursuant to Business Court Rule 7.12, the Court opts to rule on the Motion to Supplement without additional oral argument.

6. iTi is a North Carolina limited liability company that provides information technology solutions. (Compl. ¶¶ 1, 5, ECF No. 2; Answer ¶¶ 1, 5, ECF No. 4.) Seamon Whiteside is a South Carolina corporation that provides civil engineering services. (Compl. ¶¶ 2, 6; Answer ¶ 6.)

7. On 24 January 2017, iTi and Seamon Whiteside entered a Master Managed Services Agreement (the MSA). (Compl. ¶ 8; Answer ¶ 8; Pl.'s Br. Supp. Mot. J. Pleadings Ex. 1, ECF No. 17.1.) Pursuant to the MSA, iTi agreed to provide IT services, software, materials, and equipment to Seamon Whiteside in return for payment. (Compl. ¶ 8; Answer ¶ 8.) The MSA anticipated future statements of work (SOWs) to govern the parties' relationship. (MSA § 1.1.) Once the parties executed an SOW, it became part of the MSA. (MSA § 1.1.)

8. The relationship lasted for some seven years. In April 2024, Seamon Whiteside gave iTi its ninety-day notice of termination of the MSA pursuant to section 4.2 of that agreement. (Compl. ¶ 14; Answer ¶ 14; MSA § 4.2.) On 2 May 2024, Seamon Whiteside updated its notice to make clear that its termination of both the MSA and all the outstanding SOWs was "for convenience." (Compl. ¶¶ 15–16; Answer ¶¶ 15–16.)

9. Pursuant to sections 4.2 and 4.3 of the MSA, a termination for convenience triggered an obligation for Seamon Whiteside to pay an Early Termination Fee equal to the amount owed iTi for the remainder of the contract term. (MSA §§ 4.2–4.3.) iTi alleges that it calculated the fee based on its overhead costs,

including the large, fixed capital expenditures that the parties' agreements required it to make. (Compl. ¶¶ 9–10.)

10. Following receipt of Seamon Whiteside's revised termination notice, iTi sent Seamon Whiteside an email identifying all active SOWs, their remaining terms, and the estimated Early Termination Fee for each. (Compl. ¶ 19; Answer ¶ 19.) iTi sent Seamon Whiteside invoices for these fees in late June 2024, but they remain unpaid. (Compl. ¶ 21; Answer ¶ 21.)

11. Seamon Whiteside alleges that, on 30 June 2024—still within the ninety-day window between notice and termination—it discovered that there had been a security breach of its IT system and that it had lost data for the period of 12 June 2024 to 30 June 2024. (Countercls. ¶¶ 4, 10.) Seamon Whiteside notified iTi, and iTi confirmed to Seamon Whiteside that the data was inaccessible. (Pl.'s Reply Countercls. ¶ 4, ECF No. 12.)

12. Seamon Whiteside alleges that the security breach caused it to discover that iTi had not been backing up Seamon Whiteside's data since February 2024. (Countercls. ¶ 5) The parties disagree about whether backing up the data in question was iTi's contractual responsibility.

## II. PROCEDURAL BACKGROUND

13. On 28 October 2024, iTi sued Seamon Whiteside for (a) breach of contract and the duty of good faith and fair dealing, and alternatively, for (b) unjust enrichment and quantum meruit. (Compl. ¶¶ 32–46.) Seamon Whiteside counterclaimed for (a) breach of contract and the duty of good faith and fair dealing, alternatively for (b) unjust enrichment, and for both (c) negligence, and (d)

conversion. (Countercls. ¶¶ 1–19.) iTi replied and filed the Rule 12(c) Motion with respect to its breach of contract claim and all of Seamon Whiteside's counterclaims. (Pl.'s Reply Countercls.; Mot. J. Pleadings 1, ECF No. 16.)

14. After full briefing, the Court held a hearing at which all parties were present and heard. (Not. Hr'g, ECF No. 26.) The week after the hearing, Seamon Whiteside filed the Motion to Supplement seeking leave to supplement it Answer by attaching documents that Seamon Whiteside obtained in discovery. (ECF No. 28.)[2]

### III.    MOTION TO SUPPLEMENT

15. A supplemental pleading is used when the pleader wishes to add information regarding transactions or occurrences that occurred after the original pleading was filed. N.C. R. Civ. P. 15(d); *Williams v. Rutherford Freight Lines, Inc.*, 10 N.C. App. 384, 392 (1971). By contrast, an amended pleading is used, among other reasons, when the pleader wishes to add transactions or occurrences that could have been included in the original pleading but for some reason were not. N.C. R. Civ. P. 15(a); *Williams*, 10 N.C. App. at 392–93. The documents Seamon Whiteside seeks to

---

[2] On 30 September 2025, Seamon Whiteside filed an "Alternative Motion to Amend its Answer." (ECF No. 32.) In that Motion and accompanying brief, (Def.'s Br. Supp. Mot. Am., ECF No. 33), Seamon Whiteside represents that the Court "requested that the parties provide any pertinent information in this case relating to the Pleadings, the Motion for Judgment on the Pleadings or any of the subsequent filings related thereto," (Def.'s Br. Supp. Mot. Am. 3), which Seamon Whiteside characterizes as an invitation to amend or supplement the pleadings. The Court's comment at the close of the hearing ("If you have anything in the interim that you wish to bring to the Court's attention, don't hesitate. We are here to serve you.") was a general one relating to case management and not an invitation to supplement or amend the pleadings.

Because the Court treats the Motion to Supplement as a motion to amend, the Court **DENIES** the subsequently filed Alternative Motion to Amend as moot.

attach to its pleading relate to events predating its Answer and involve transactions and occurrences that could have been included in that pleading. Consequently, they are not the proper subject of a motion to supplement.

16. Nonetheless, the Court shall, in its discretion, treat Seamon Whiteside's Motion to Supplement brought pursuant to North Carolina Rule of Civil Procedure (the Rules) Rule 15(d) as a motion to amend brought pursuant to Rule 15(a). *Cf. Foy v. Foy*, 57 N.C. App. 128, 132–33 (1982) (reversing trial court's denial of motion to supplement mislabeled as motion to amend as abuse of discretion when court stated no reason for denial).

17. "Leave to amend lies within the trial court's discretion, though should be freely given 'when justice so requires.' " *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 279 (2023) (quoting N.C. R. Civ. P. 15(a)). "When justice so requires" is among the most liberal standards in all the Rules. *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018) (citing Wilson, *North Carolina Civil Procedure*, § 15-3). This is because the Rules favor adjudication of cases on the merits. *See id.* (quoting *Mangum v. Surles*, 281 N.C. 91, 98–99 (1972)).

18. iTi asserts futility as a basis to deny leave to amend. It contends that the Court should deny Seamon Whiteside's Motion to Supplement because, even after amendment, Seamon Whiteside could not withstand iTi's motion for judgment on the pleadings. It is well-established that a motion to amend will be denied when the amendment would be futile. *See, e.g., Smith v. McRary*, 306 N.C. 664, 671 (1982).

19.     Determining whether the amendment would be futile necessarily turns on the legal sufficiency of Seamon Whiteside's pleading with the new exhibits attached.  Therefore, the Court turns to iTi's Rule 12(c) Motion.

## IV.     MOTION FOR JUDGMENT ON THE PLEADINGS

20.     Rule 12(c) requires the Court to view the facts and draw permissible inferences in the light most favorable to the nonmoving party.  *Tully v. City of Wilmington*, 370 N.C. 527, 532 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51–52 (2016)).  "[A]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false."  *Id.* (quoting *CommScope Credit Union*, 369 N.C. at 51–52).  "Legal conclusions, however, are not entitled to a presumption of validity."  *Charlotte Motor Speedway, LLC v. County of Cabarrus*, 230 N.C. App. 1, 6 (2013) (quoting *Guyton v. FM Lending Servs., Inc.*, 199 N.C. App. 30, 33 (2009)).

21.     "The movant is held to a strict standard," *Newman v. Stepp*, 376 N.C. 300, 305 (2020) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974)), and "must show that no material issue of fact exists and that he is entitled to judgment as a matter of law," *Tully*, 370 N.C. at 532 (quoting *Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 682 (1987)).  The movant is not entitled to judgment on the pleadings "merely because the claimant's case is weak and he is unlikely to prevail on the merits."  *Huss v. Huss*, 31 N.C. App. 463, 469 (1976). Rather, Rule 12(c)'s purpose "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack

of merit[.]" *Anderson Creek Partners, L.P. v. County of Harnett*, 382 N.C. 1, 11–12 (2022) (quoting *Ragsdale*, 286 N.C. at 137).

## 1. **Intrinsic v. Extrinsic Material**

22.    When addressing the Rule 12(c) Motion, the Court may consider the parties' written contracts properly before it. S*ee Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 56 (2001) (documents may be considered when they are "the subject of [the] complaint and to which the complaint specifically refers"); *Robertson v. Boyd*, 88 N.C. App. 437, 441 (1988). In this case those contracts are the MSA, and the Disaster Recovery as a Service Statement of Work (the DRaaS SOW, and together with the MSA, the Agreements). (Pl.'s Br. Supp. Mot. J. Pleadings Exs. 1–2, ECF Nos. 17.1, 17.2.) *Cf. Mkt. Am., Inc. v. Lee*, 257 N.C. App. 98, 109 & n. 6 (2017) ("A trial court's consideration of a contract which is the subject matter of an action does not expand the scope of a Rule 12(b)(6) hearing and does not create justifiable surprise in the nonmoving party." (citation modified) (quoting *Oberlin Cap., L.P.*, 147 N.C. App. at 60)).[3]

---

[3] The only documents referenced specifically in the Complaint that are currently before the Court are the MSA, (Compl. ¶ 8; Answer ¶ 8), and the DRaaS SOW, (Compl. ¶ 11; Answer ¶ 11), the latter of which incorporates by reference Managed Services Quotes AAAQ4051 and AAAQ4595, (DRaaS SOW § 2.2), as well as the 2023 DRaaS Change Request. Neither the Complaint nor the Answer specifically references the Backup SOW, (Pl.'s Br. Supp. Ex. 3, ECF No. 17.3 [hereinafter Backup SOW]), or the Colocation SOW, (Pl.'s Br. Supp. Ex. 4, ECF No. 17.4 [hereinafter Colocation SOW]), which iTi discussed and attached in its briefing. (*See, e.g.*, Compl. ¶ 17; Answer ¶ 17.) The reference to SOW #SWA02242017 does not match any documents the Court received in connection with the Motion. (Compl. ¶ 11.)

Moreover, of the SOWs discussed in iTi's briefing, only the DRaaS SOW was in effect when iTi's alleged breach occurred in the first half of 2024. (*Compare* DRaaS SOW Change Request (extending contract through 2026), *with* Backup SOW (three-year term beginning 2017), *and* Colocation SOW (same).) Although both the Backup SOW and the Colocation SOW contain

23. Whether the Court may also consider Seamon Whiteside's proposed attachments is a different question. The Court's consideration when deciding a Rule 12(c) motion is limited to matters alleged in the pleadings. The reason for the restriction is that Rule 12(c), like Rule 12(b)(6), tests a claim's legal sufficiency, not its evidentiary support. *Blue v. Bhiro*, 381 N.C. 1, 5–6 (2022) (discussing Rule 12(b)(6)); *Tully*, 370 N.C. at 532 (discussing Rule 12(c)).

24. As this Court has explained, matters within the pleadings are "intrinsic." Matters outside the pleadings are "extrinsic." *Bucci v. Burns*, 2018 NCBC LEXIS 37, at *8–9 (N.C. Super. Ct. April 25, 2018). The Rules generally exclude extrinsic matter from consideration at the pleadings stage to give the nonmoving party "reasonable opportunity to present all material made pertinent" to a motion for summary judgment. N.C. R. Civ. P. 12(c).

25. Intrinsic material encompasses the pleadings themselves, including the complaint, answer, and reply. N.C. R. Civ. P. 7(a). In addition, Rule 10(c) provides that "any written instrument which is an exhibit to a pleading is a part thereof for all purposes." N.C. R. Civ. P. 10(c); *Krawiec v. Manly*, 370 N.C. 602, 606 (2018) (quoting N.C. R. Civ. P. 10(c)) (considering "exhibits attached to the complaint" on 12(b)(6) motion); *Bucci*, 2018 NCBC LEXIS 37, at *8–9 ("Exhibits to the complaint are therefore intrinsic, not extrinsic, and a court may consider them without

---

automatic renewal provisions, (Backup SOW §§ 7.2, 9.0; Colocation SOW §§ 7.2, 9.0), nothing in the pleadings or the documents themselves establishes that these SOWs continued beyond their original three-year terms. Accordingly, the Court does not consider these SOWs for purposes of iTi's Rule 12(c) Motion.

converting a motion to dismiss 'into a motion for summary judgment.' " (quoting *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204 (2007)).

26.     The term "written instrument" is a broad one that embraces "all sorts of documents."  G. Gray Wilson, *North Carolina Civil Procedure* § 10-4.[4]  Here, the discovery responses and emails that Seamon Whiteside seeks to add are within the scope of written instruments that Rule 10(c) contemplates.  Accordingly, the Court considers them in its analysis.

27.     The official commentary to Rule 10 supports this conclusion.  *See* N.C. R. Civ. P. 10(c) cmt. ("The second sentence, directly sanctioning the incorporation of attached exhibits involves no change in procedure.  The phrase 'for all purposes' is apt to avoid the type of decision which quibbles over whether mere attachment of an exhibit without express words purporting to incorporate particular aspects as direct allegations does have this effect.").  Leading treatises on North Carolina civil procedure support this conclusion as well.  *See* Alan D. Woodlief, Jr., *Shuford North Carolina Civil Practice and Procedure with Appellate Advocacy*, § 10:6 (2025) ("The second sentence of Rule 10(c) continues and improves former North Carolina practice by eliminating, with the use of the words 'for all purposes,' the question of whether attaching an exhibit without specific language incorporating a particular portion of

---

[4] Those documents include U.S. Citizenship and Immigration Services, *Krawiec*, 370 N.C. at 616; police department incident reports, deposition transcripts, and online medical articles, *Ji v. City of Raleigh*, 2010 N.C. App. LEXIS 1764, at *8 & n. 1 (N.C. Ct. App. Sept. 7, 2010) (unpublished decision); and complaints in related federal court actions, *Stanback v. Stanback*, 297 N.C. 181, 205 (1979), *overruled on other grounds by Dickens v. Puryear*, 302 N.C. 437 (1981)

the exhibit has the effect of pleading that portion. . . . Since the exhibit is a part of the pleading for all purposes, the sufficiency of the pleading may be attacked by reference to the exhibit *and may be the basis for judgment on the pleadings.*" (emphasis added) (footnotes omitted)); G. Gray Wilson, *North Carolina Civil Procedure*, § 10-4 (4th ed. 2025) ("Since an exhibit becomes a part of a pleading 'for all purposes,' it is not necessary to adopt it by reference in the pleading itself, or even refer to it at all, although it is customary and certainly avoids confusion to do so."), § 12-13 ("On a motion for judgment on the pleadings, the court is to consider only the pleadings and any attachments thereto, which become part of the pleadings.").

28.     Here, the additional materials do not change the claims but merely add facts that Seamon Whiteside contends support its position.  iTi does not argue otherwise; it argues only that the amendment would be futile "[f]or the same reasons set forth in [iTi]'s [12(c) Motion] [b]rief."  (Pl.'s Br. Opp. Def.'s Mot. Suppl. 8, ECF No. 31; *compare* Pl.'s Br. Supp. Mot. J. Pleadings 6–26, *with* Pl.'s Br. Opp. Def.'s Mot. Suppl. 9–16.)  Accordingly, the Court addresses iTi's Rule 12(c) Motion.

## 2. iTi's Breach of Contract Claim and Seamon Whiteside's Counterclaims

29.     iTi requests judgment in its favor on its breach of contract claim and dismissal of Seamon Whiteside's counterclaims.  Because the viability of iTi's breach of contract claim depends on whether Seamon Whiteside's breach of contract claim survives, *Dishner Devs., Inc. v. Brown*, 145 N.C. App. 375, 378–79 (2001) (noting one party's breach excuses other party's performance), *aff'd per curiam*, 354 N.C. 569 (2001), the Court turns first to the counterclaims.  It then addresses iTi's own claim

for breach of contract, as well as its Motion to Strike Seamon Whiteside's Sur-Reply, (ECF No. 23).

30. iTi moves to dismiss all four of Defendant's counterclaims: (a) breach of contract and duty of good faith and fair dealing, (b) unjust enrichment, (c) negligence, and (d) conversion. The Court addresses each counterclaim in turn.

### a. Seamon Whiteside's Breach of Contract Claim

31. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 276 (2019) (per curiam) (citation modified); *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369 (2005) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)).

32. Breach occurs only when one party fails to perform some obligation appearing expressly in the contract or necessarily implied in its language. *See Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 304 (1985). In other words, the law enforces obligations that were within the parties' contemplation when they made their agreement. *See id.*

33. When a contract's plain language is clear, the Court need examine only that language to determine the intent of the parties. *State v. Philip Morris USA Inc.*, 363 N.C. 623, 631–32 (2009). The Court considers the contract as a whole, seeks to harmonize the entire agreement, and enforces unambiguous contracts as written. *Id.* at 633, 636.

34. Seamon Whiteside's breach of contract claim turns on the scope of iTi's contractual obligation to secure Seamon Whiteside's data. Seamon Whiteside

contends that the Agreements required iTi to ensure that the data was backed up at all times. (Countercls. ¶ 2.) Therefore, according to Seamon Whiteside, iTi's failure to back up its data beginning in February 2024—revealed as a result of the June 2024 security incident—breached iTi's contractual obligation. (Countercls. ¶¶ 5, 9.)

35. In response, iTi insists that the Agreements did not impose an obligation on it to back up the data in question. (Pl.'s Reply Countercls. 3–4 & ¶¶ 5–6.) iTi pleads that the Agreements required only that it license the hardware and software, provide electricity for the equipment, and connect the on- and off-site systems. (Pl.'s Reply Countercls. 3–4 & ¶¶ 5–6.) It points to options in the DRaaS SOW that would have required it to provide additional support, monitoring, and management, but that Seamon Whiteside declined to select. (Pl.'s Reply Countercls. 3–4; DRaaS SOW § 2.3.) In any event, it claims that the Agreements clearly assign all risk of loss of data to Seamon Whiteside, not to iTi. (Pl.'s Reply Countercls. 5–7.)

### i. iTi's Obligations Under the MSA

36. To determine the scope of iTi's obligation, the Court turns to the plain language of the Agreements. Relevant here, section 6.0 requires iTi to make efforts to "help [Seamon Whiteside] to secure [its] data and content against accidental or unlawful loss[.]" (MSA § 6.0.) That section also requires iTi to ensure the physical security of the equipment it licensed to Seamon Whiteside, which was located in iTi's data center. (MSA § 6.0.)

37. But the MSA then limits these obligations through the risk-allocating provisions of section 2.0. (*See* MSA § 6.0 ("Without limiting [Seamon Whiteside]'s obligations under section 2.0 . . . .").) And, pursuant to section 2.3, Seamon Whiteside

"assume[d] responsibility for all content, material, message or data" and "to back-up and/or otherwise protect all data against loss, damage, or destruction." (MSA § 2.3.) Section 2.5 assigns to Seamon Whiteside the responsibility for securing the cloud-computing service. (MSA § 2.5.) It also disclaims iTi's liability for losses from hacking. (MSA § 2.5.)

38.   Taken together, the provisions in the MSA place responsibility on Seamon Whiteside to ensure that its data was backed up. As a result, Seamon Whiteside cannot rely on the language of the MSA alone to support its claim for breach of contract. However, the MSA also makes clear that, to the extent an SOW's terms are inconsistent with those in the MSA, the terms of the SOW control. (MSA § 16.1.) Consequently, the Court must consider the language of the DRaaS SOW.[5]

**ii.   iTi's Obligations Under the DRaaS SOW**

39.   The scope of work provided in the DRaaS SOW appears in section 2.3 and the attached "Managed Services Quote." Section 2.3 includes options for various services, including management, support, and monitoring. Seamon Whiteside specifically declined those options and selected only cloud services that included hardware, software, space, cooling, and related services. (DRaaS SOW § 2.3.)

40.   The two quotes attached to the DRaaS SOW provide additional detail regarding the scope of iTi's obligations. (DRaaS SOW Quote AAAQ4051, Quote

---

[5] In its Answer, Seamon Whiteside neither refers to nor attaches any existing SOW. Instead, it refers generally to "back up services known as the data recovery plan" or "DRP." (Countercls. ¶ 2.) In its brief, Seamon Whiteside attempts to clarify that it meant to refer to the DRaaS SOW. (*Compare* Countercls. ¶ 2, *with* Def.'s Br. Opp'n Mot. J. Pleadings 2, ECF No. 19.)

AAAW4595.) iTi agreed to provide, among other things, useable data cabinet space, electricity, connection among data centers and servers, the servers themselves, licensed replication software, and internet access. (DRaaS SOW Quote AAAQ4051, Quote AAAW4595.) A quote in the DRaaS SOW titled "Managed Services" is marked "N/A" for the monthly price of network monitoring at the "Monitor" level of service, indicating that it was not applicable. (DRaaS SOW 3.)

41. Nowhere does the DRaaS SOW require iTi to ensure continuous backup of Seamon Whiteside's data on the hardware and software it provided and physically secured. To the contrary, the DRaaS SOW expressly provides that iTi bore no responsibility for "data loss due to virus or malware" or "for configurations, monitoring, and maintenance of the [Seamon Whiteside] data protection plan." (DRaaS SOW § 7.0.) A 2023 change request added more hardware and extended the SOW term for three years but otherwise did not affect iTi's contractual obligations. (DRaaS SOW Change Request §§ 2–3.)

42. The DRaaS SOW provides for the "configuration" of Seamon Whiteside servers, including installation and configuration of the "Cisco UCS Manager," (DRaaS SOW Quote AAAQ4051, Quote AAAW4595), but it disclaims iTi's responsibility "for configurations, monitoring, and maintenance of the [Seamon Whiteside] data protection plan," (DRaaS SOW § 7.0).

43. Nevertheless, despite the plain language of the Agreements presented, neither party has alleged that only the MSA and DRaaS SOW control, and the Court cannot conclude that no *other* contractual obligations exist between the parties.

Indeed, it was iTi that introduced two other SOWs to the briefing. Moreover, nothing in the documents properly before the Court forecloses the possibility that iTi failed to perform services that the parties called the "data recovery plan," and Seamon Whiteside's allegation that iTi failed to provide those services under the MSA, (Countercls. ¶¶ 6–7, 10), is adequate to survive judgment on the pleadings under the applicable and liberal pleading standard.[6]

44. Rule 12(c) requires that inferences be drawn in favor of the nonmoving party. iTi's protests that Seamon Whiteside's case is weak are not enough; the moving party must show that no material issue of fact exists and that he is entitled to judgment as a matter of law. Because the pleadings do not establish that all pertinent contractual provisions are before the Court, judgment on Defendant's counterclaim for breach of contract must await a more developed record.

45. Accordingly, iTi's Rule 12(c) Motion for judgment with respect to Seamon Whiteside's claim for breach of contract shall be **DENIED**.

### b. Breach of Good Faith and Fair Dealing

46. The law implies that parties to a contract will act in good faith and be fair in their dealings. *See Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 23–24 (2024) (discussing covenant as contract term); *Cordaro v. Huntington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018) ("Under North Carolina law, every contract contains

---

[6] As Seamon Whiteside discusses in its Brief in Support of its Motion to Supplement, some of the factual materials it seeks to add to its Answer suggest that iTi had taken on some level of responsibility for securing Seamon Whiteside's data. (Def.'s Br. Supp. Mot. Suppl. 5–6; *id.* Exs. 1–6, ECF Nos. 29.2–29.7.)

an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." (citation modified) (quoting *Bicycle Transit Auth.*, 314 N.C. at 228); *Maglione v. Aegis Fam. Health Ctrs.*, 168 N.C. App. 49, 56 (2005) ("In addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms." (citation modified)).

47. In this case Seamon Whiteside's contract claim survives iTi's Motion, but its claim for breach of the covenant of good faith and fair dealing does not. This is because Seamon Whiteside bases its good faith and fair dealing claim on the same allegations that give rise to its breach of contract claim. "As a general proposition, where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, we treat the former claim as 'part and parcel' of the latter." *Cordaro,* 260 N.C. App. at 38–39; *see also Eye Dialogue LL v. Party Reflections, Inc.*, 2020 NCBC LEXIS 90, at \*39 (N.C. Super. Ct. July 28, 2020) ("[I]f a plaintiff brings a breach of contract claim and a claim for breach of the covenant of good faith and fair dealing based on the same facts, the two causes of action are treated as one and the same.")

48. Accordingly, iTi's Rule 12(c) Motion with respect to Seamon Whiteside's claim for breach of the duty of good faith and fair dealing shall be **GRANTED.**

### c. Unjust Enrichment

49. Seamon Whiteside asserts an alternative claim for unjust enrichment based on the same conduct underlying its breach of contract claim. (*See* Countercls. ¶¶ 12–15.) The parties agree that an express contract governs their dispute.

(Compl. ¶ 8; Answer ¶ 8.) Therefore, Seamon Whiteside's claim for unjust enrichment fails. *SciGrip, Inc. v. Osae*, 373 N.C. 409, 432 (2020) ("If there is a contract between the parties, the contract governs the claim and the law will not imply a contract." (citation modified) (citing *Boe v. Shadrick*, 322 N.C. 567, 570 (1988)).

50.     Accordingly, iTi's motion with respect to Seamon Whiteside's unjust enrichment claim shall be **GRANTED,** and judgment shall be entered in favor of iTi with respect to this claim.

### d. Negligence

51.     Seamon Whiteside alleges that iTi negligently failed to perform its contractual obligations under the Agreements. (Countercls. ¶ 16.)  "The economic loss rule bars recovery in tort by a plaintiff against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill."  *Cummings v. Carroll*, 379 N.C. 347, 359 (2021) (quoting *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 376 N.C. 54, 58 (2020)).

52.     Because Seamon Whiteside asserts nothing more than iTi's alleged failure to perform its contractual obligations, the economic loss rule bars Seamon Whiteside's counterclaim for negligence.  Accordingly, iTi's motion with respect to this claim shall be **GRANTED** and judgment shall be entered in favor of iTi with respect to this claim.

### e. Conversion

53.     Seamon Whiteside claims that iTi converted its servers by failing to return them after the MSA terminated. (Countercls. ¶ 18.)  Conversion requires the "*unauthorized* assumption and exercise of the right of ownership" over another's

personal property "to the alteration of [its] condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (emphasis added) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439 (1956)).

54. iTi responds that both contract and statute authorize it to possess the servers and therefore it cannot be liable for conversion. (Pl.'s Reply Countercls. 8; Pl.'s Br. Supp. 18–20.) It further contends that the economic loss rule bars the conversion claim. (Pl.'s Reply Countercls. 8.)

### i. iTi's Contractual Authorization to Possess the Servers

55. A party's contractual authorization to possess property is sufficient to defeat a conversion claim. *See Variety Wholesalers*, 365 N.C. at 524–25 (analyzing contract terms to determine whether alleged conversion was unauthorized). The Agreements in this case authorize iTi to retain Seamon Whiteside's equipment as security for outstanding payments Seamon Whiteside owes to iTi. (MSA § 4.3.) However, as the pleadings make plain, Seamon Whiteside and iTi dispute whether any payments remain outstanding. (Part IV.2.a, *supra* ¶¶ 36–46.)

56. Therefore, giving Seamon Whiteside the benefit of inferences with respect to iTi's 12(c) Motion, at this stage the Court cannot conclude as a matter of law that iTi's contractual right to possess the servers defeats Seamon Whiteside's conversion claim.

### ii. iTi's Statutory Authorization to Possess the Servers

57. Section 44A-2 of the North Carolina General Statutes provides:

(a) Any person who tows, alters, repairs, stores, services, treats, or improves personal property other than a motor vehicle or an aircraft in the ordinary course of his business pursuant to an express or implied contract with an owner or legal possessor of the personal property has a lien upon the property. The amount of the lien shall be the lesser of

(1) The reasonable charges for the services and materials; or

(2) The contract price; or

(3) One hundred dollars ($100.00) if the lienor has dealt with a legal possessor who is not an owner.

N.C.G.S. § 44A-2(a) (2025).

58. The parties agree that iTi stores IT equipment in the ordinary course of its business, (*see* Compl. ¶¶ 5, 7; Answer ¶¶ 5, 7), and that it provided Seamon Whiteside services under the Agreements. (Compl. ¶¶ 11–12; Answer ¶¶ 11–12.) But they do not agree that a lien has arisen in favor of iTi. It will be up to iTi to show that such a lien exists. At this stage, the Court cannot conclude as a matter of law that iTi has a statutory right to possess the servers.

### iii. Economic Loss Rule

59. As discussed above, in accordance with the economic loss rule, a mere breach of contract does not give rise to a tort claim. *See N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81–82 (1978), *overruled in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 242 (1985). As our Supreme Court has observed, the rule exists to "prevent 'contract law from drowning in a sea of tort.'" *Crescent Univ.*, 376 N.C. at 59 (citation modified) (quoting *E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 866 (1986)).

60. However, *Ports Authority* identified four categories of cases in which a tort claim was permitted to proceed in a contract action. One of those categories involves "wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor." *Ports Authority,* 294 N.C. at 81–82.

61. This Court has construed *Ports Authority* to permit conversion claims in contract disputes only when extra-contractual duties, such as those of a bailee, are present and have been violated. *Window Gang Ventures, Corp. v. Salinas*, 2019 NCBC LEXIS 24, at *29–30 (N.C. Super. Ct. Apr. 2, 2019) (citing (citations omitted); *accord Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F. 3d 158, 165–66 (4th Cir. 2018) (construing *Ports Authority* to hold that economic loss rule bars conversion claim absent showing of extra-contractual duty); *see also Di Frega v. Pugliese*, 164 N.C. App. 499, 463–64 (2004); *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 532 (2001).

62. Here, the servers that Seamon Whiteside claims iTi converted were the subject of the Agreements. But iTi also alleges that it has an independent statutory right to possess the servers. *Ports Authority* permits a claim for conversion when the duty allegedly violated is not based in contract. Therefore, the Court cannot conclude at this stage that the economic loss rule bars Seamon Whiteside's conversion claim.

63. Accordingly, the 12(c) Motion with respect to Seamon Whiteside's conversion claim shall be **DENIED**.

### f. iTi's Breach of Contract Claim

64. In addition to its defensive motion for judgment on Seamon Whiteside's counterclaims, iTi seeks judgment in its favor on its claim that Seamon Whiteside

breached the Agreements by failing to pay iTi Early Termination Fees.[7] (Compl. ¶¶ 32–36.)

65. As this Court has observed, "stating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super Ct. June 19, 2019). "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." *Link*, 372 N.C. at 276.; *cf. Cordaro*, 260 N.C. App. at 37 (When "the complaint alleges each of these elements, it is error to dismiss a breach of contract claim under Rule 12(b)(6)." (quoting *Woolard v. Davenport*, 166 N.C. App. 129, 134 (2004)).

66. Seamon Whiteside alleges that iTi's earlier failure to secure its data is a breach that excuses Seamon Whiteside's obligation to pay the Early Termination Fees. (Answer ¶ 50.) Construing the pleadings in the light most favorable to Seamon Whiteside, as the Court must, the Court cannot conclude as a matter of law that no material issue of fact exists with respect to an earlier breach of the Agreements by iTi.

67. But Seamon Whiteside protests that the Early Termination Fee is a penalty that is unenforceable on its face and that iTi's Motion with respect to its breach of contract claim should be denied on that basis alone.

---

[7] The parties agree that, following termination of the MSA, Seamon Whiteside requested that iTi continue certain services (the Continuing Agreement). (Compl. ¶ 25; Answer ¶ 25.) Although iTi alleges that Seamon Whiteside breached the Continuing Agreement, it does not seek judgment with respect to that part of its claim. (Pl.'s Br. Supp. Mot. J. Pleadings 5.)

68. "A penalty is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach, or as security . . . to insure that the person injured shall collect his actual damages." *E. Carolina Internal Med., P.A. v. Faidas*, 149 N.C. App. 940, 945 (2002) (quoting *City of Kinston v. Suddreth,* 266 N.C. 618, 620 (1966).

69. "[A] stipulated sum is for liquidated damages only (1) where the damages which the parties reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach or is reasonably proportionate to the damages which have actually been caused by the breach." *Knutton v. Cofield*, 273 N.C. 355, 361 (1968) (citing 22 Am. Jur. 2d, Damages § 214).

70. Whether the liquidated amount is a reasonable estimate of damages is influenced by the status of the parties at the time of making the contract. *Id.* at 362. When the parties are sophisticated, as they are here, more deference is given to their estimate of damages. *Faidas*, 149 N.C. App. at 947 (citing *Bradshaw v. Millikin*, 173 N.C. 432 (1917)).

71. In this case, the amount of damage iTi would suffer from a breach of the Agreements depends upon the number and status of the SOWs in progress at the time the breach occurs—an amount that is sufficiently uncertain to justify a liquidated damages provision. Further, the pleadings allege that the Early

Termination Fees are calculated based on the price Seamon Whiteside agreed to pay for iTi's services. iTi alleges that the high, up-front, fixed cost of providing the services justifies charging the full amount. (Pl.'s Br. Supp. Mot. J. Pleadings 25.)

72. Because the allegations support iTi's position that the Early Termination Fee reasonably approximates otherwise uncertain damages, the Court concludes that it is an enforceable liquidated damages provision, not a penalty. Nevertheless, whether iTi is entitled to collect liquidated damages is far from certain and depends upon whether it can prevail on the merits of its breach of contract claim.

## IV.    MOTION TO STRIKE SUR-REPLY BRIEF

73. Pursuant to Rule 12(f), iTi moves for an order striking Seamon Whiteside's sur-reply brief opposing the 12(c) Motion. (Def.'s Sur Reply Br. Opp'n Mot. J. Pleadings, ECF No. 22; Pl.'s Mot. Strike 1, ECF No. 23.) Business Court Rule 7 does not contemplate the filing of a sur-reply absent permission from the Court. Because Seamon Whiteside did not seek permission prior to filing the brief in question, the filing was improper, and the Court has not considered it. iTi's Motion to Strike shall be **GRANTED**.

## V.    CONCLUSION

74. **WHEREFORE**, the Court, in its discretion, and after considering the relevant pleadings and matters of record, **ORDERS** as follows:

(a) Seamon Whiteside's Motion to Amend is **GRANTED.** Seamon Whiteside shall file its amended Answer and Counterclaims, adding the exhibits it identifies, within ten days;

(b) iTi's Rule 12(c) Motion is **GRANTED** in part and **DENIED** in part as follows:

 i. The Rule 12(c) Motion is **GRANTED** and judgment is entered in favor of iTi with respect to Seamon Whiteside's counterclaims for breach of the covenant of good faith and fair dealing, unjust enrichment, and negligence;

 ii. In all other respects, the Rule 12(c) Motion is **DENIED**.

(c) iTi's Motion to Strike Seamon Whiteside's Sur-Reply Brief is **GRANTED.**

**IT IS SO ORDERED**, this the 30th day of September, 2025.


/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases